## THE PEOPLE v. WILLIAM McCORD.

*Criminal law—Charge to jury—Burglary—Intent—Prevention of crime—Arrest—Unnecessary violence.*

1. Charging a jury that the respondent had admitted all that was necessary to convict him, if not so insane or intoxicated as to be able to form no intent, and pointing out to them that his conduct did not indicate any lack of reasoning power, is neither more nor less than an instruction to convict.

2. The offense of burglary cannot be made out without *clear* proof of a breaking.

3. It may be true that a person does not lose the character of an injured party by merely *waiting* and *watching* for expected developments. Possibly,—but we do not care to decide this,—leaving temptation in the way without further inducement will not destroy the guilt in law of the person tempted, although it is a diabolical business. But it would be a disgrace to the law if a person who has taken active measures to persuade another to enter his premises, and take his property, can treat the taking as a crime, or qualify any of the acts done by invitation as criminal.

4. Neither law nor morality can tolerate the use of needless violence, even upon the worst of criminals.

5. If crime can be readily prevented without injuring the criminal, every wanton injury is a trespass, and may become a crime; and the same is true of an arrest.

Exceptions before judgment from Iosco. (Simpson, J.) Argued June 20, 1889. Decided July 11, 1889.

Respondent was convicted of statutory burglary. Conviction set aside and prisoner discharged. The facts, and points of counsel *passed* upon by the Court, are stated in the opinion.

*Charles R. Henry,* for respondent.

*S. V. R. Trowbridge,* Attorney General, and *H. M. Elliott,* Prosecuting Attorney, for the people.

CAMPBELL, J. Respondent was charged with the offense of breaking and entering by night into the store of Richards, Hubbell & Co., of Baldwin township, Iosco county, with intent to commit larceny, and was convicted. There was testimony indicating without doubt that he entered the store in question with the intention of stealing. There was also testimony tending to deny the criminal quality of what he did, both on the ground of drunkenness, and that of being led to enter the premises while more or less intoxicated, by some one else, whose act would exonerate him.

Some of the prominent facts require to be mentioned. It appears that four persons, provided with weapons, were at the store at the time in question, which was about 1 o'clock in the morning of October 21, 1888. One of these persons was Mr. Hubbell, a member of the firm. The others were there to help. Two, one of whom had also a sledge handle, were armed with revolvers, one with a gun, and another with a sledge handle. They were expecting him, and on his entry in the store he was set upon and shot in the head, having one eye put out, and suffering very serious wounding and beating. He was accompanied by one Robert Flint, who had told the occupants when the act was to be done. Flint, although disguised, was recognized, and not molested.

Flint was not an officer or detective, but appears to have taken up, under some arrangement, the business or part of a detective for the time. He had been employed by certain persons to look up certain other persons supposed to have committed some crimes, and his pecuniary interest depended partly, at least, on his securing conviction. It is urged that respondent was led into what he did by Flint for the purpose of entrapping him,—advantage being taken of his intoxication, if that was not actually induced for the purpose; and it is claimed this went far enough to exonerate respondent.

The building was entered by means of a standing ladder, not placed by respondent, reaching up to a window up-stairs

in a tin-shop. This window, which was one sliding, and not lifting, and usually held in place by a nail, was on that night left unfastened. The record does not clearly indicate that the tin-shop was part of the store, but it was assumed and perhaps was so. A door down-stairs, which opened into the store proper was also left unfastened, and apparently had nothing generally to hold it but a hook, which was not then in the staple. The two persons went into the store with no noise whatever to indicate their presence. As already indicated, Flint was not molested at all, while respondent was very badly maimed and hurt.

Flint, when asked how he came to be there that night with McCord, says:

"I went there with William McCord under the direction of Dr. Webster, and also Mr. Hubbell."

When asked who was leading this arrangement in the store, —of going in,—he said:

"Well, neither of us was leading it.'

But when asked who organized or planned the job, he said it was McCord; and, in answer to further questions, testified to his previous interviews with respondent, and habitual frequenting saloons with him nearly every night. Coming down to the night in question, he said he and McCord, with a third person, were in a saloon together until after 9 o'clock, when they separated, and McCord went towards home, and that they met by concert, after midnight, and went to the store. On this evening Flint says he looked after respondent in several places before he found him in Henry's saloon, and gave respondent to understand he was ready for anything. Flint's story is not consistent as to their occupation between 9 and midnight. But when asked the particular question he always answered that McCord was the instigator.

The only person sworn as a witness who was not in some way concerned in the transaction, testified to seeing respond-

ent drunk, on his way home, late in the evening, and Flint stopping him. Respondent himself, when on the stand, testified that a member of his family was sick, and he did not want to go through the store; but that Flint stuck to him through the evening, and finally pursuaded him, while drunk, to go and do what was done. One Fox, who was with Flint and McCord in a part of their evening's dissipation, corroborated McCord's story as to his desire to go home to his family, and their sickness alleged as the reason.

This is enough to indicate the nature of the contention. The court in charging the jury spent a little time in telling them about the various statutes concerning burglary in dwellings, and then informed them of the statutory elements of the crime charged, and what must be shown. Upon this no fault is found.

But the court then mentioned, as an important inquiry, whether the act was done by a "sane person, in his right mind."

" That," he said, " must be proven to you beyond a doubt; because a man that has not got any mind cannot form an intent, whether he is intoxicated or whether he is crazy."

He added, under exception:

" I think the fact as to breaking and entering the building has been proven pretty fully to you by the people. Defendant admits that he went there, climbed up the ladder, and went through the window, from the roof into the building, and that he was caught there. He says they were there for the purpose of stealing. Now, I don't care whether the window was nailed or it was not. If it was shut, and they went there from the roof up this ladder, it was a breaking such as this law contemplates. The only real question for you is whether this man was intoxicated, so that he was not accountable for what he did."

The court then, after some discussion of drunkenness in connection with criminal purpose, which is objected to chiefly because claimed to have put the facts more strongly than was warranted, proceeded to argue very forcibly the reasons why

respondent was not incapable of responsibility, and laid before the jury their duty in the premises, dwelling rather heavily on the duty of convicting guilty men. The charge concluded as follows:

"Of course, there has been considerable said about the manner in which this matter has been worked up. As has been remarked, detectives are necessary. Crime is committed on the sly. Men don't commit crime in the day-time, in the open street. They do it in the back alleys, and in the dark, and it takes detectives to find them out; and while detectives sometimes resort to means which are really reprehensible,— and I say right here, if a man should resort to intoxicating liquors, or intoxicate his subject, in order to lead him into these things, I say those acts are reprehensible, and they are not to be encouraged,—yet, if the crime was committed, it is nothing to us. We have a duty to perform, and should perform it. You must find, as I have stated, all the ingredients of this offense established by evidence that you believe, beyond a reasonable doubt, before you can convict of crime; but, if you should so find, then it is your duty to convict."

Having told the jury that respondent had admitted all that was necessary to convict him, if not so insane or intoxicated as to be able to form no intent, and having pointed out to them that his conduct did not indicate any lack of reasoning power, this charge was neither more nor less than an instruction to convict, with the further instruction that, although Flint might have made respondent drunk and led him purposely to do what he did, the law took no account of this, and respondent should be convicted.

The case is not one which seems to require any discussion of the question of intoxication, in the bearing dwelt on by the court. We shall not, therefore, discuss that branch of the case, further than to say that the court, by putting that as the only inquiry open to the jury, assumed to decide that the case was open to no dispute on any essential fact. This was unwarranted. There were not only questions of fact disputed and depending on the veracity of Flint, whom the jury were not bound to credit, but there were questions not cleared

up at all. It was not sworn to by any one that the window, which was not held down by its own weight, and from which the only fastening had been removed, was in such a position that the entrance was procured by any such process as would constitute a breaking. Respondent swore that Flint told him he had removed the nail which fastened it. Some one had done so, and no noise was heard when it opened, if it was not already open. Respondent swore Flint went in first, and that respondent followed him. Without more definite proof, a breaking, which is the essential element in burglary, cannot be said to have been admitted, and cannot be said to have been so proved as to leave nothing for the jury. It is possible, if not probable, that there was no breaking, and from what appears on this record it is not really proved at all. There is no proof whatever that any door was broken open. Here, again, the proof is the other way. The statutory offense cannot be made out without clear proof of a breaking. Upon the lack of proof respondent was, as the record stands, apparently entitled to acquittal of the charge.

But our duty to public justice and decency requires us to dispose of the other views of the case. In some of its features it is one of the most disgraceful instances of criminal contrivance to induce a man to commit a crime in order to get him convicted that has ever been before us. If the prisoner's statement is believed, and the court in the latter part of the charge seems to have assumed it was probable, he was not the active agent in the crime, but guilty of aiding and abetting Flint, and therefore only guilty if Flint was guilty. It would be absurd to hold Flint guilty of burglary. He did what he was expected to do, and had no such intent as would hold him responsible. It may be true that a person does not lose the character of an injured party by merely waiting and watching for expected developments. Possibly,—but we do not care to decide this,—leaving temptation in the way without further inducement will not destroy the guilt in law of

the person tempted, although it is a diabolical business, which if not punishable probably ought to be. But it would be a disgrace to the law if a person who had taken active measures to persuade another to enter his premises, and take his property, can treat the taking as a crime, or qualify any of the acts done by invitation as criminal. What is authorized to be done is no wrong in law to the instigator. In this case Flint was active in the matter, as is shown by his own testimony, and the circumstances are clear that it was by such authority as would exonerate him and his victim from criminal responsibility. If the transaction which is the basis of the prosecution was actually designed, as it was actually expected, by the persons in the store, they deserve something more than censure for such a scheme.

But the cruel and brutal reception of the respondent is beyond palliation. Neither law nor morality can tolerate the use of needless violence, even upon the worst criminals. If crime can be readily prevented without injuring the criminal, every wanton injury is a trespass, and may become a crime. The same is true of an arrest. In this case the crime could certainly have been prevented, even if it was not invited. The respondent was where he could have been arrested without injury to him or any one else. Under such circumstances his treatment was cowardly and atrocious, and, had his injuries proved fatal, the persons who were responsible for it would have found it a very serious matter.

The record exemplifies the excesses which are frequently produced by private persons who undertake to assume the pursuit and detection of criminals. The annals of crime contain many instances of such lawlessness, and their results are not re-assuring. That respondent is not a good member of society is hardly questioned. But it is not edifying when persons who would be horrified at being classed among crim-

inals forget their legal duties, and imagine that any end can justify bad means.

The conviction must be set aside, and upon the record as it stood when the case went to the jury we cannot see how they could have convicted the prisoner, under a correct view of the law. He must therefore be discharged, without delay.

The other Justices concurred.