EDDIE L. SHOUQUETTE v. STATE.

No. A-4097.   Opinion Filed Nov. 3, 1923.
(219 Pac. 727.)
(Syllabus.)

1. Criminal Law—Fact that Accused Entrapped by Officers no Defense Except Where Officer Proposed Crime and Was Chief Moving Actor—Aiding Offender Liable Only upon Participation in Every Ingredient of Crime. Ordinarily, it is not against public policy for private detectives and officers to set a trap for one suspected of planning the commission of a crime, and, if he commits the crime, even though aided or encouraged by the officers or detectives who laid the trap, the fact that he was so entrapped will be no defense.

    (a) This rule will not apply, however, where a detective proposes a robbery, and is the chief moving actor in the forcible taking of the property. To hold the aiding offender criminally responsible, he must have participated in every ingredient of the offense charged.

2. Same—Necessity for Instructions Covering Issue as to Whether

**One Acting with Procurer of Crime Liable.** Where one acts as a detective to entrap others in the commission of a contemplated robbery, and where he urges and induces others to join with him, and the detective himself proposes and plans the robbery, and is the chief actor in the forcible taking of the property, which would not have been taken without such inducements, to make one so induced to participate with him criminally ressponsible, the person so aiding such principal actor must have participated in every ingredient of the offense charged, making as to him a complete offense, independent of the acts of the procuring detective.

(a) Under such circumstances the person appearing to act in concert with the detective is actuated by a different motive, and is not, strictly speaking, an accomplice of the procurer, and, not being an accomplice, he would not be a principal, unless his acts alone include all the elements of the crime charged.

(b) Where such an issue of fact is raised by the evidence an appropriate instruction as to the law governing that issue should be given.

3. **Robbery—Taking Property with Consent of Owner to Entrap not "Robbery."** Where property is taken with the consent of the owner, such taking does not constitute robbery, although the object of the taking is to entrap the perpetrator, who has no knowledge of such consent, but really intends to commit the crime.

4. *Criminal Law—Nonliability of One Participating in Crime at Instigation of Detective.* Where a private detective, in conjunction with officers of the court, acts as a decoy, and is himself the chief instigator of and performs the major part of the offense, such scheme will be deemed to be against public poilcy, constituting a good defense against the conviction of any who were induced to participate, and who would not have participated without such inducements.

Appeal from District Court, Tulsa County; Redmond S. Cole, Judge.

Eddie L. Shouquette was convicted of bank robbery, and he appeals. Reversed and remanded.

Springer & Wilson, for plaintiff in error.

Geo. F. Short, Atty. Gen., and N. W. Gore, Asst. Atty. Gen., for the State.

BESSEY, J. Eddie L. Shouquette, plaintiff in error, here designated the defendant, was on February 5, 1921, informed against jointly with John E. Bradshaw, A. B. Christman, Frank Stanley and others for the robbery of the Sperry Guaranty Bank. After severance this defendant was tried and found guilty, with his punishment assessed at confinement in the penitentiary for a term of 15 years. From this judgment he appeals.

The record shows that the actors connected with this case were implicated in plots, duplicity, intrigue, and the application of the double cross, surpassing the fiction of a Diamond Dick novel. The actors were bankers, detectives, crooks, ex-convicts, robbers and women of the underworld, whose schemes were planned and developed at a disreputable road house, a gambling den, a cache for the storage of firearms, and an illicit whisky still near Tulsa.

The evidence shows that James S. Saunders, an ex-convict and all-around crook was employed during December, 1920, by Eugene P. Gum, secretary-manager of the Oklahoma Bankers' Association, to co-operate with any bank robbers known to him or with whom he might thereafter become acquainted, and, if necessary, to aid, abet, and participate in any bank robbery that to him might seem advisable, for the purpose of decoying and apprehending any such bank robbers as might co-operate with him.

The Sperry Guaranty Bank in Tulsa county was a member of the Oklahoma Bankers' Association, and entitled to its services in all matters connected with such association's purposes, among which was ''general mutual protection and bus-

iness co-operation among the member banks.''

Pursuant to his arrangement with the association, Saunders had one or more conferences with Eugene P. Gum, H. O. Brown, manager of the Burns' Detective Association, and Newt Graham, another member of the bankers' association, and the chief of police of Tulsa, in room No. 508, Exchange National Bank Building. He here informed these gentlemen that his associates contemplated robbing some bank, probably the Sperry bank. Saunders was advised to go ahead and cooperate with the others and, if necessary, to participate in this or any other robbery they might suggest. In order that these men might know that any bank robbery so perpetrated was participated in by Saunders and his associates, the leaden ball from a rifle cartridge was extracted and the powder removed, and a note written on a small piece of paper inserted therein, as follows:

"Dec. 28, 1921.

"The boys request that you keep this bit of evidence for your wise Burns' detectives. Don't show it to any one until he comes, as he thinks he is so d—— wise.''

Saunders was to leave the cartridge containing this note in the bank where he and his companions did the robbing, thus showing that Saunders was one of the participants.

On the afternoon of the 28th of December, 1920, the Sperry bank was robbed by Saunders and four other armed men, who fled from the scene of the robbery to a still in the Osage hills, where the loot was distributed among them, and certain women there awaiting their arrival. After the robbery the cartridge containing the note, as previously arranged, was found in the bank. In the consummation of the robbery, Saunders was the only man who went behind the grill, where he went to the cashier's drawer and desk, and

placed all the money in sight in a sack, which he carried out to a waiting automobile in which he and his companions drove away. Saunders kept the sack of money between his feet until they arrived at the still. There he divided the loot equally among them, and demonstrated that he was a "good fellow" by giving the ladies there present certain gold coin souvenirs and other money.

Pursuant to agreement, Saunders reported to his employers, Gum and others, and delivered to them the remaining part of his share of the money so taken, after deducting his expenses and disbursements incident to the enterprise, presumably including the cost of some corn whisky, Jamaica ginger, and the value of the gold and currency presented to the "ladies."

The defendant in this case says: First, that he was not present and did not participate in the robbery—that he was a victim of circumstances, and was convicted largely on the uncorroborated testimony of an accomplice; second, that the robbery, if it was a robbery, was committed with the knowledge and consent of the bank, through its authorized agents; and, third, that the robbery was in fact committed by James M. Saunders, a hired stool pigeon, and that the others implicated were neither principals nor accessories to the robbery.

Upon the question of an alibi the jury found the facts against the defendant. The defendant was a young man, 19 years of age, with no particular occupation. When he was 8 years old a playmate accidentally put out one of his eyes. At the time of the robbery he was assisting his mother in taking care of a rooming house in Tulsa. The defendant was not positively identified as being present at the bank, except by Saunders, who himself admitted doing the major part of the holdup, and by Mr. Martin, who said defendant was the

man who pointed a gun at him, and that he wore smoked glasses, so that witness did not notice the missing eye. There was evidence from others relative to defendant's subsequent conduct which indicated his participation. This court would not be justified in disturbing the verdict of the jury on the ground of insufficiency of the evidence.

To elucidate the other assignments of error it will be necessary to quote excerpts or a condensed statement of the evidence from this voluminous record, abounding in interesting though sordid details. A condensed story of the decoy Saunders is as follows:

"Before going to Tulsa on December 20, 1920, I had a, conversation with Eugene P. Gum of the bankers' association, who employed me as a detective at a salary of $200 per month and expenses; I was supposed to associate myself with such thieves, robbers, and others as I might find who were contemplating or were willing to associate themselves with me in robbing banks; I was not to participate in the robberies unless I had to, but I was instructed that if necessary I was to take part and procure all the evidence possible. On my arrival at Tulsa I went to the Astor Rooms on Second street, where I met Frank Stanley and his wife; I told Stanley that a party had sent me to him, and told me he needed some workers, and that I am ready to go to work. Stanley said his bunch was pretty badly scattered, and that he did need some men, as he contemplated pulling off some big jobs. I remained there all day, and we consumed a considerable quantity of Jamaica ginger, that night we went for a drive and took Christman with us, and we talked about pulling off some small deal to make money for Christmas; I stayed at the Astor Rooms that night. The next morning Stanley, Christman, and I drove over into West Tulsa; we went to the Jacobs Dry Goods store there and looked it over; they said that would be a good place to 'knock off,' as they handled a considerable number of railroad checks. I stayed with Stanley at the Astor Rooms that

night, where we drank a good deal of corn whisky and Jamaica ginger; we again went to the Jacobs store in West Tulsa and waited for the store to close up. Christman went inside the store, and came out and got into the car, and we drove to a restaurant and had lunch. I had a flash light in my pocket, and as I was getting in the car a policeman grabbed the flash light and tried to pull me back out of the car; the policeman thought it was a pistol I had; Stanley was on the inside of the car, and he had an automatic in his hand. We decided it would be dangerous to pull off the store deal that night.

"The next night I went to Oklahoma City, arrived there Christmas morning. There I had another conference with Mr. Gum, and I returned to Tulsa, to the Astor Rooms, that night. On the morning of the 27th Stanley and I went to Sandy McMillan's road house to meet some of Stanley's friends; after a while Stanley, Christman, and a boy they called 'Country Slim' went to a power house nearby and got some highpowered rifles, a sawed-off shot gun, and some automatic pistols, and one of them told Sandy we were going to 'knock off a jug.' From there we drove in a red-wheeled Hudson out to a still northwest of Sperry, where we met Emma McKenzie and Clark Watson; they were there making whisky, and we purchased some of the whisky, and stayed there about two hours; we then drove on to Sperry, arriving there about 12:30. We stopped in front of the bank of Sperry, and we noticed a Marmon car standing across the street; Stanley wanted us to get out and 'make it.' We got out and tried the front door of the bank, but it was locked for the noon hour. We then drove back to the still, and from there back to McMillan's road house, where we deposited the artillery in the power house from where it was taken; Christman drove with Stanley and me to the end of the car line, and Stanley and I returned to our rooms.

"I next had a conference with the chief of police of Tulsa, Mr. Gustafson, in room 508, Exchange National Bank Building, in the presence of Mr. Graham, connected with that bank, and also a member of the Oklahoma Bankers' Associa-

tion, and in the presence of Mr. Brown, a member of the Burns' Detective Agency for Oklahoma. I told them we contemplated robbing the Sperry bank the next day, and one of the men there, possibly Mr. Brown, pulled the bullet out of a Savage rifle cartridge and poured the powder out of it, and put a note in the cartridge shell. Whatever place we robbed I was to leave this cartridge with this note in it, so they would know it was our bunch that did the job.

"The next morning, December 28th, Stanley and I again went out to the McMillan road house, where we met Christman; Christman then drove into town, and brought out Eddie Shouquette; we talked about robbing the Sperry Bank in the presence of Sandy McMillan. After having a few drinks of whisky, and watching the gambling games for a while, we got the Hudson speedster from the garage there, put the guns and pistols we had the day before into the car, and Shouquette, Stanley, Christman, Clemens, and I drove from the road house at about 10:30 over to Emma McKenzie's still, arriving there about noon. We told Watson and Emma McKenzie that we were fixing to knock off the Sperry bank, and that we wanted to come back there after we had robbed the bank to split the money. Emma agreed to this, and gave us a pillow case off of a pillow to put the money in. We left the Hudson car at the still, and drove Watson's Ford car, removing the gage and putting on the curtains, and transferred the artillery, and drove this Ford to Sperry. We stopped behind the schoolhouse, and Christman went to the bank to look over the situation. He came back and reported that it looked all right; that the Marmon car wasn't there. We then drove up to the bank. Shouquette went in first, then Stanley, and I followed with the sack. Clemens sat in the back seat of the car with a high-powered rifle, and Christman sat at the wheel, with the engine running. Stanley and Shouquette, with drawn pistols, ordered the customers in the bank to hold up their hands, and I went back of the grill where the money was and put it in the sack. One of the customers grabbed at Shouquette's pistol, and tried to knock it out of his hand; Stanley hit him over the head with his six-shooter, accidental-

ly discharging it. I took all of the money out of the drawers at the cashier's window and off his desk, consisting of paper currency, silver, and some gold pieces, something over $1,400 altogether. Nothing was taken out of the vault. In passing by I looked into the safe, and went right on out the front door, got in the car with the rest of the bunch, and drove away, returning by a circuitous route to Emma McKenzie's still. There we went some distance from the house, and each party sat down with his hat in front of him; I then distributed the bills, first from a roll of twenties, placing one in each hat as long as they lasted; and then so on with the currency of different denominations. The silver was then distributed in the same way, until we got to the small packages; these we gave to the women. Some of it we gave to Christman's wife, and $100 to Emma McKenzie. The twenty dollar gold piece I found in my pocket, and I gave it to Emma Bradshaw; Emma McKenzie found a five dollar gold piece, and she had it made into a ring, and sent it to her husband in the penitentiary.

"Christman and I stayed there around the still until after night; Emma McKenzie took Jerome Clemens to Skiatook, and as soon as she returned she drove with Stanley and Shouquette to the end of the Tulsa car line; Christman and I drove in with the Hudson speedster, bringing the firearms with us; these we put back in the power house at Sandy McMillan's. I stayed at Sandy's a part of that night. The next morning Jerome Clemens and Christman were there. Christman gave Sandy $50, and I gave him $50; I suppose that was for the use of the guns. Christman also paid him $60 that he owed him. About 12 o'clock of the night of the robbery I turned over to Graham, Brown, and the chief of police, at 508 Exchange National Bank Building, my part of the money taken in the robbery, all that was left, amounting to about $150. I had paid out a considerable part of it for whisky and other things, and I had left $50 in small change silver coins in a glove hidden out at the stillhouse, but when we went back to get it it could not be found."

Elsewhere in the record it is shown that Shouquette was

subsequently arrested in Oklahoma City, in front of the Saunders house, and Christman was arrested about the same time in the home of Saunders, 715 East Fourth street. Stanley was later arrested at Claremore.

The record shows the authority given Saunders by Brown, Graham, and Gum of the Bankers' Association, as follows:

From the testimony of Eugene P. Gum:

"Q. What instruction did you give him with reference to his work here in Tulsa? A. Well, I instructed him to secure all the information he could with reference to certain parties who were alleged to have been organized against the banks in Oklahoma.

"Q. Did you tell him to go and help rob any banks or anything of that nature? A. No, sir.

"Q. You did not. Did you tell him to get all the evidence he could? A. Yes, sir.

"Q. To identify the parties? A. Yes.

"Q. If necessary, to get with them? A. Yes, sir.

"Q. Is the Guaranty State Bank of Sperry a member of the Oklahoma Bankers' Association? A. Yes, sir.

"Q. Your association has authority, does it to employ men to work for the banks for the purpose of detecting people who are committing crimes against the banks? A. Yes, sir.

"Q. At the time Saunders was employed you were acting for and on behalf of the association in his employment, were you? A. Yes, sir.

"Q. At the time Saunders was employed you were acting for the association of which this Guaranty State Bank at Sperry is a member? A. Yes, sir.

"Q. You had authority to employ him to do anything you wanted him to do? A. Yes, sir.

"Q. On behalf of the Oklahoma association? A. Yes, sir.

"Q. And in your employment of him to do what he did do you were acting for the Oklahoma association? A. Yes, sir.

"Q. Now, what instructions did you give Saunders at that time? A. I told him not to participate in it unless he had to, and not with reference to any particular bank, for we didn't know.

"Q. But if he had to participate in it, to participate? A. Yes, sir; and give us the information."

From the testimony of Mr. Graham, Tulsa banker:

"Q. Now it was agreed, was it, that he (Saunders) was to go along with certain robbers to assist in robbing that bank, if necessary? A. Well, it wasn't agreed that he would go along and rob that bank. I thought it was going to be the First National Bank of Broken Bow.

"Q. I was asking you about this one. A. He agreed to stay with them under instructions.

"Q. To do what? A. To stay with the gang.

"Q. And to be a part of them? A. Not necessarily.

"Q. To collect evidence? A. If possible to get out of the actual robbery.

"Q. But if necessary, to go in and participate? A. Yes, I think so. They didn't give him those instructions then, but I think he had those instructions. * * *

"Q. Now, Mr. Graham, you knew that there was no felonious intent upon the part of this man Saunders to steal and keep any of that money himself, didn't you, from the arrangement that they made with the officers? A. Well, I didn't think he was going to keep any of it.

"Q. And he did bring back and surrender to you and Mr. Gustafson the money he got as his part? A. Yes, to Mr.

Gustafson in my presence.

"Q. And he was keeping you informed all the time as to the maneuvers of the different parties whom he expected to rob the Sperry bank? A. We wasn't very sure it was going to be the Sperry Bank, we thought it would be within 18 miles of Tulsa.

"Q. You thought it enough to notify Mr. Winters? A. Yes, after they attempted it on the 27th I knew they had attempted that and I tried to get him."

From the testimony of Mr. Brown, Burns' detective:

"Q. Are you acquainted with Mr. Gustafson, the chief of police of this city? A. Yes, sir.

"Q. Did you see him there that night (508 Exchange National Bank)? A. Yes, sir.

"Q. Are you acquainted with Newt Graham? A. Yes, sir.

"Q. Did you see him there that night? A. Yes, sir.

"Q. Was Mr. Saunders there? A. Yes, sir.

"Q. I will ask you to state, Mr. Brown, if during the discussion of that evening at that time and place you prepared a cartridge? A. Yes, sir.

"Q. Have you seen the cartridge that has been exhibited here? A. Yes, sir.

"Q. And the note that was placed in it? A. Yes, sir.

"Q. Was that prepared there that night in room 508, under your direction? A. Yes, sir.

"Q. Handing the witness State's Exhibit B, Mr. Brown, I will ask you to look at that notation on there, and ask you to state who put that notation on there? A. Mr. Newt Graham's signature is on there, and Mr. Jacobs', the second initial; I forget the gentleman's name, and the fourth one there is my initials.

"Q. What date is it? A. December 28, 1920.

"Q. When did you put that on there? A. Put that on there—

"Q. When was that notation put on there, Mr. Brown? A. The notation here?

"Q. Yes, sir. A. On the evening of the 28th.

"Q. Where did you get that cartridge that day? A. On the counter of the Guaranty State Bank of Sperry.

"Q. Sir? A. On the counter of the Guaranty State Bank of Sperry.

"Q. Mr. Brown, where did you get this cartridge, you say? A. On the counter.

"Q. Where? A. Of the Guaranty State Bank of Sperry.

"Q. On what date? A. The afternoon of December 28th.

\*   \*   \*

"Q. Now, did you tell him (Saunders) to cooperate with them as one of the gang so that he might deceive them and they believe he was one of them? A. Do any part that came to hand? His instruction was to get the information as to when and where the bank was to be robbed, and stay out of it if possible, but if the situation came up in such a way that he was forced to go with them without uncovering himself, to go ahead on the job.

"Q. And to participate in it? A. Yes, sir.

"Q. That was the instruction given to him by you as a deputy sheriff and an officer of the Oklahoma State Bankers' Association, and by Gustafson, as an officer? A. I think that was about the instruction.

"Q. That was the instruction given by Mr. Graham? A. I believe so.

"Q. All of you agreed? A. We all agreed.

"Q. Now what was he to do with the part of the money that was to come to him out of the robbery? A. He was to turn it in.

"Q. He was to turn it in? A. Yes, sir.

"Q. And did he do as instructed? A. Yes, sir."

Saunders claims that his companions were thieves and bank robbers, and that he acted only as an informer and decoy. The defendant claims that the testimony indicates that Saunders was more than a decoy; that he actively planned and was the chief actor in the consummation of the robbery, and that his companions, some of them mere boys, partially under the influence of corn whisky and Jamaica ginger, were by him solicited and induced to aid him in its commission, and that without such inducements from Saunders the crime would not have been committed. That if the defendant Shouquette and others were present, since Saunders, who actually took, kept, and divided the money obtained from the bank, was not guilty of robbery, his companions were not aiders and abettors of Saunders in the commission of a robbery, for the simple reason that it is conceded that Saunders committed no robbery, and they, not being aiders and abettors of another in a legal sense, could not be principals, unless the offense and every element of it was committed by them, independent of the acts committed by Saunders.

Suppose Saunders, the decoy, had lured Shouquette, the defendant, alone to assist him in taking this money. Under that state of facts Shouquette could not have been an accomplice, because the originator and chief executor of the affair was not guilty of robbery. Would the rule be any different where more than one was lured into the trap? If these associates were not accomplices of Saunders, could they be accomplices of one another, so as to make each a principal within

the meaning of our statute making all persons who aid or participate in the commission of an offense principals and punishable as such? We think not, unless those procured to assist the person who laid the trap did such acts, independent of the act of the procurer, as amounted to a larceny committed by them alone. From the evidence in the case upon that issue the jury might have found either way, hence we think the trial court could have submitted an instruction upon that issue of fact. Such an instruction was requested and refused.

Ordinarily, it is not against public policy for officers to set a trap for one suspected of planning the commission of a crime, and, if he commits the crime, even though aided or encouraged by the officer who laid the trap, the fact that he was so entrapped will be no defense. This rule will not apply, however, where the decoy proposed a robbery, and was the chief moving actor in the forcible taking of the property. To hold the aiding offender criminally responsible, he must have participated in every ingredient of the offense charged. 1 Brill, Enc. Crim. Law, § 187; Woo Wai v. United States, 223 Fed. 412, 137 C. C. A. 604; Roberts v. Territory, 8 Okla. 326, 57 Pac. 840; People v. McCord, 76 Mich. 200, 42 N. W. 1106; United States v. Echols (D. C.) 253 Fed. 862; Brill, supra, § 188; State v. Currie, 13 N. D. 655, 102 N. W. 875, 69 L. R. A. 405, 112 Am. St. Rep. 687.

The facts in the Woo Wai Case, supra, are as follows:

"In October, 1908, Fernando Sanford, a confidential agent of the immigration commission, then in charge of the investigation of offenses in violation of the immigration laws on the Pacific coast, suspected that Woo Wai, a Chinese merchant, who had resided for many years in San Francisco, possessed information in regard to previous unlawful importations of Chinese women into San Francisco, and the complicity therein of certain officers of the immigration commission. He conceived the scheme of obtaining a hold on Woo

Wai, in order to make him tell what he knew, by luring him into the commission of an offense against the laws of the United States, by bringing Chinese across the Mexican border into California, for which he was thereafter to be indicted and convicted, all for the purpose of bringing pressure * * * upon him to make him 'come through.'

"To carry out this scheme, Sanford, at the expense of the United States, employed a detective. The detective, whose name was Roy, approached Woo Wai, and suggested to him that he knew a scheme by which they could make money. Without disclosing the nature of the scheme Roy induced Woo Wai to accompany him to San Diego. Both the expenses of Woo Wai and Roy on that journey were paid out of the treasury of the United States. Roy introduced Woo Wai to the local inspectors of immigration at San Diego, Ralph L. Conklin, and Harry H. Weddle. Sanford had informed these inspectors of the nature of the scheme. It is to be said in justice to the inspectors that they entered into the scheme with great reluctance. In their presence and in the presence of Woo Wai, Roy made the proposition that they permit Woo Wai to bring Chinese across the Mexican border, for which they should receive $50 a head. They assented, but Woo Wai said: 'This is in violation of the law. It could not be done.' * * *

"During the summer of 1909 Roy was again urging Woo Wai to go to San Diego and enter into the scheme which had been devised, and Conklin wrote him several letters for the same purpose. The inspectors explained to Woo Wai the means by which Chinese could be brought across the border, the routes which they should follow, and the methods by which they could avoid arrest. Conklin went so far as to go to San Francisco to interview Woo Wai. It was not until about April 1, 1910, that Woo Wai finally assented to enter into the scheme which had been so assiduously and persistently urged upon him. He engaged his codefendants, Wong Chung and Wong Yee, to assist him."

In reversing the judgment of conviction rendered against Woo Wai for this offense, the court said:

"In the case at bar there is no evidence that, prior to the time when the detective first approached Woo Wai, any of the defendants had ever been engaged in the unlawful importation of Chinese, or had ever committed or thought of committing any offense against the immigration laws. * * *

"Second. We are of the opinion that it is against public policy to sustain a conviction obtained in the manner which is disclosed by the evidence in this case, taking the testimony of the defendants to be true, and that a sound public policy can be upheld only by denying the criminality of those who are thus induced to commit acts which infringe the letter of the criminal statutes. Some of the courts have gone far in sustaining convictions of crimes induced by detectives and by state officers. This is notably so of the decision in People v. Mills, 178 N. Y. 274, 70 N. E. 786, 67 L. R. A. 131. But it is to be said, by way of distinguishing such cases from the case at bar, that * * * the criminal intention to commit the offense had its origin in the mind of the defendant. Thus, in People v. Mills, it was the defendant who made the first suggestion looking toward the commission of the criminal act, and for the commission of that act the district attorney furnished him opportunity, and lent him aid. In the case at bar, the suggestion of the criminal act came from the officers of the government. The whole scheme originated with them. In O'Brien v. State, 6 Tex. App. 665, the court said that a case is not within the spirit of the Criminal Code where an officer 'originates the * * * intent, and apparently joins the defendant in the criminal act first suggested by the officer, merely to entrap the defendant.' In Commonwealth v. Bickings, 12 Pa. Dist. R. 206, it was said: 'No state, therefore, can safely adopt a policy by which crime is to be artificially propagated. * * * This is virtually the case of a detective who, by promising to perpetrate a crime, lures an innocent man to aid and abet him, the object being, not the perpetration of the crime, but the luring of the abettor.' "

In the case of People v. Collins, 53 Cal. 185, it was held:

"Parnell informed the sheriff that Collins had requested

him to enter a house in the night-time, and steal therefrom a sum of money which he knew to be concealed there, the money to be divided between them. By advice of the sheriff, Parnell agreed to do so, for the purpose of entrapping Collins, and accordingly entered the house, secured the money, marked it so that it could be identified, and, after delivering it to Collins, gave a signal, when the sheriff arrested Collins with the money in his possession. Held, that, inasmuch as Parnell alone entered the building, and did so without felonious intent, there was no burglary committed, and therefore Collins could not have been privy to a burglary.''

In the case of State v. Jansen, 22 Kan. 498, Justice Brewer, speaking for the court, said:

''Where one is charged with crime, the mere fact that one who was present with and apparently assisting him in the commission of the crime was simply a detective, constitutes no defense. While, perhaps nothing that is actually done by the detective may be imputable to him, as there is no community of purpose, yet if he with a criminal intent personally does every act which is essential to the crime charged, his guilt is complete. * * *

''The act of a detective may, perhaps, not be imputable to the defendant, as there is a want of community of motive. The one has a criminal intent, while the other is seeking the discovery and punishment of crime. But where each of the overt acts going to make up the crime charged, is personally done by the defendant, and with criminal intent, his guilt is complete, no matter what motives may prompt or what acts be done by the party who is with and apparently assisting him. Counsel have cited and commented upon several cases in which detectives figured, and in which the defendants were adjudged guiltless of the crimes charged. But this feature distinguishes them, that some act essential to the crime charged was in fact done by the detective, and not by the defendant, and, this act not being imputable to the defendant, the latter's guilt was not made out. Intent alone does

not make the crime. The intent and the act must combine; and all the elements of the act must exist and be imputable to the defendant.''

The authorities are all agreed that where property is taken by the consent of the owner, such taking does not constitute robbery, although the object of the taking is to entrap the perpetrator, who has no knowledge of such consent, but really intends to commit the crime. The absence of consent is an essential element of the crimes of robbery, larceny, burglary, train-wrecking, and other kindred crimes. Brill, Enc. Crim. Law, vol. 1, § 189; Love v. People, 160 Ill. 508, 43 N. E. 710, 32 L. R. A. 139; State v. Abley, 109 Iowa, 61, 80 N. W. 225, 46 L. R. A. 862, 77 Am. St. Rep. 520; State v. Stickney, 53 Kan. 308, 36 Pac. 714, 43 Am. St. Rep. 284; People v. McCord, 76 Mich. 200, 42 N. W. 1106; State v. Hayes, 105 Mo. 76, 16 S. W. 514, 24 Am. St. Rep. 360; Speiden v. State, 3 Tex. App. 156, 30 Am. Rep. 126.

The facts in the case of Love v. People, supra, were much like the facts in the case at bar. The story of the Love Case is long and replete with many details, a recitation of which would extend this opinion unnecessarily.

It is also well settled that the consent of the owner to the forcible taking of his property must be given by some one having authority to consent to the particular act. State v. Currie, supra; State v. Abley, 109 Iowa, 61, 80 N. W. 225, 46 L. R. A. 862, 77 Am. St. Rep. 520; Love v. People, supra; People v. McCord, supra; notes and annotations, 25 L. R. A. 343; notes 81 and 83, § 189; Brill, supra.

Under the law as stated in the foregoing discussion and the precedents cited, do the facts appearing in evidence show that the persons in charge of the bank consented to the taking of its property by Saunders and his companions? To us it seems a close question of fact, involving an issue of law,

that should have been submitted to the jury under proper instructions.  The mere fact that the robbery, or pretended robbery, was previously arranged by Gum and others representing the Oklahoma Bankers' Association, of which the Sperry bank was a member, would not alone by sufficient to imply such consent, but that fact, in connection with other evidence tending to show that the association and its members were co-operatively engaged in employing procurers and detectives to discover bank robbers and lay traps to catch them, and, if necessary, to actively take part in any and all robberies so planned and executed, might be construed as amounting to the consent of the contributing members. The complex maneuvers, inducements, and tricks employed make a clear deduction as to such consent or want of consent difficult.   We believe that under all the circumstances there was enough testimony indicating consent on the part of the Sperry bank to go to the jury under appropriate instructions.

An instruction of this character was offered, but refused by the court.   The instruction offered did not correctly state the law, but it was sufficient to call the court's attention to the issue of consent or lack of consent, making it the duty of the court to advise the jury as definitely as possible upon that issue.   The instructions given did not clearly cover the issue of consent.

Gustafson and Brown were peace officers—officers of the court—who were in part responsible for this alleged robbery.  So frequently it has been demonstrated, and the facts in this case again demonstrate, that the practice of employing one thief to catch another, by participating with him in the commission of the offense, is of doubtful propriety. It is a bad investment, financially. Plans like this to entrap bank robbers are often, as in this case, executed at the expense of insurance companies that write burglary insurance, and un-

der such circumstances, where a private detective, in conjunction with officers of the court, acts as a decoy and is himself the chief instigator of and performs the major part of the offense, such scheme will be deemed to be against public policy, constituting a good defense against the conviction of any who were induced to participate, and who would not have participated without such inducements. Persons with criminal inclinations may never commit crime where no favorable opportunities are presented, and persons of that character should not be encouraged in the commission of crime by private detectives or by officers of the law. The evils resulting from such practice outweigh the good that may be accomplished. Love v. People, supra.

The companions of Saunders may have been guilty of an attempt to rob, or of the larceny of the money taken by each of them at the time it was divided at the still, but without apt instructions upon the issue as to their performance of every ingredient act constituting the offense, and for the other reasons stated, the conviction for robbery should be set aside. It is therefore so ordered, and the cause remanded for further proceedings not inconsistent with this decision.

MATSON, P. J., and DOYLE, J., concur.