**Ronald Justin WRIGHT, Appellant,**
v.
**The STATE of Oklahoma, Appellee.**
**No. F–74–633.**

Court of Criminal Appeals of Oklahoma.
May 5, 1975.
Rehearing Denied May 30, 1975.

Lucas & Cate, Norman, for appellant.

Larry Derryberry, Atty. Gen., James L. Swartz, Asst. Atty. Gen., James D. Bednar, Legal Intern, for appellee.

## OPINION

**PER CURIAM:**

Appellant, Ronald Justin Wright, hereinafter referred to as defendant, was charged, tried and convicted in the District Court, Cleveland County, Case No. CRF–73–204, for the offense of Conspiracy to Murder, in violation of 21 O.S.1971, § 421. The jury recommended, and the court imposed, a sentence of one (1) year imprisonment and a fine of Five Hundred ($500.00) Dollars. From said judgment and sentence a timely appeal has been perfected to this Court.

Defendant and Carey David Raley (not involved in this appeal), were charged with conspiracy to murder Officer Mark Boyd of the Norman Police Department. According to the evidence adduced at trial by the State, the conspiracy developed during a series of meetings and transactions involving defendant, several of his companions, and three individuals working undercover for the Federal Drug Enforcement Administration. The first meeting, which occurred at approximately 7:00 p. m. on May 15, 1973, in the coffee shop of the Holiday Inn in Norman, had been arranged between a Donald King and Mike Miller, an undercover informant working under the direction of FDEA Special Agents Roland Battleson and Frank Alexander. Agent Battleson's version of the first meeting was as follows:

He (Battleson), Alexander, and Miller arrived in the coffee shop to find defendant and Donald King already seated in a booth. Miller introduced Battleson to the latter two as "Ed," whereupon Battleson, posing as a "hit man," asked the defendant, "Are you the man who wants the officer killed?", to which defendant replied, "Yes, I am." Battleson asked defendant if any other individuals were involved, and defendant replied that there were. Battleson then told defendant that he would like to meet them, and defendant agreed to try to arrange such a meeting. (Tr. 22) After further conversation, during which defendant identified the intended victim as Officer Boyd, the parties separated, with defendant and King agreeing to contact the agents that evening—both as to a proposed narcotics transaction and as to the possibility of meeting the other murder conspirators.

The informant Miller's testimony consisted solely of his statement that he had introduced the Special Agents to defendant and King at the above place and time.

According to the State, the next meeting involving defendant occurred on the afternoon of May 16, 1973, at the Howard Johnson Restaurant in Norman. The Special Agents testified that they arrived there first, and were joined shortly by defendant, who was accompanied by Carey David Raley and David Lester Reed. Referring to Raley, Agent Battleson asked defendant, " . . . is this the man that wants the officer killed?" to which defendant replied, "Yes, it is." (Tr. 28) Battleson and Raley then went out into the parking lot where the agent opened the trunk of an unmarked government car and inspected a rifle which the agent pretended was to be used in the murder. Raley stated that he thought the weapon should be sufficient to do the job. (Tr. 31) When the two returned to the booth inside the restaurant, Raley remarked (in defendant's presence), "That is quite a machine you have got" to which Battleson replied, "Yes, it should work all right." (Tr. 33) During the course of the conversation, the parties negotiated the price for the killing, with Agent Battleson initially stating that he normally charged $5,000.00; then Raley said that he had lined up someone who would do it for $1,500.00, at which time Battleson lowered his price to $2,500.00. Raley agreed to that price and the parties proceeded to his apartment elsewhere in Norman, with Raley, Reed and Battleson in Raley's car, and Agent Alexander and defendant in another car.

During the transaction which followed in Raley's apartment, Agent Battleson testified that Raley produced two boxes containing what was claimed to be $1,500.00

worth of narcotics. Battleson told him he was "satisfied," (Tr. 37), and commented to defendant (who was present at all times), that Officer Boyd must have really upset people to cause them to try to kill him. Defendant replied, "yes, that Boyd had been irritating a lot of people and had been stopping them a lot for traffic violations and had busted a lot of people in Norman." (Tr. 39) At that point Raley and Agent Alexander left the apartment for approximately an hour and a half in order to make arrangements for a proposed drug transaction. During their absence, defendant, Reed, and Agent Battleson were left alone in the apartment, but did not discuss the proposed murder. When Raley and Alexander returned, everyone except Reed moved to the kitchen table where discussion about the murder resumed. Battleson told Raley that he was willing to accept $1,000.00 worth of drugs to complete the contract, and further testified that he "told Mr. Raley that I wanted some show on his part to let me know some payments . . . to let me know that I had the contract to do the killing and that he wouldn't give someone else my job." (Tr. 41) Raley then agreed to give Battleson $100.00 worth of drugs as a down payment, and gave him three bags containing tablets which Raley claimed were amphetamines. After inspecting the drugs, Battleson again "asked Raley if this was a satisfactory arrangement." Raley looked at defendant, who "nodded his head affirmatively" (Tr. 42), and Raley then indicated his agreement. The agents left shortly thereafter.

Agent Alexander's testimony as to the first meeting was substantially the same as Battleson's, except for one minor deviation.[1] His version of the second meeting was also the substantial equivalent of Battleson's; however, he added that he (Alexander), passing as a drug dealer, had conversed primarily about a drug transac- tion rather than the proposed murder. As to the transaction at Raley's apartment, Alexander's testimony again corroborated Battleson's, though he added the following account of the transfer of the three bags of amphetamines:

"Q. (By Mr. Boswell) . . . You were all seated at the table, and Mr. Raley came back in toward the table and made these statements, and then what occurred?

A. (By Agent Alexander) To the best of my recollection, before Mr. Raley handed these three bags to Agent Battleson, he asked Mr. Raley . . . . I mean, Mr. Raley asked if Mr. Wright was sure that we were okay.

Q. And did Mr. Wright reply?

A. There was no reply as far as words were concerned.

Q. Was there any kind of physical sign?

A. Yes, sir, there was a nod on the part of Mr. Raley."[2] (Tr. 80)

On cross-examination, Agent Alexander testified that the first meeting had been arranged by the informant Miller, who had put the witness in touch with Donald King concerning a possible narcotics deal. (Tr. 82)

Defendant's version of the facts was presented through his own testimony and that of Donald King. King testified that he had been contacted a few weeks prior to the first meeting by the informant Miller, who had told him that he knew of some potential narcotic buyers. The first meeting with the agents, said King, was for the purpose of carrying out a narcotics deal, and defendant, whom King said was not connected with the narcotics deal or the murder plot, was "just with me." (Tr. 96) King further testified that defendant had attended the second meeting only for the purpose of introducing Raley to the agents

---

1. Agent Alexander testified that the informant Miller had introduced him to defendant first, while Agent Battleson stated that it had been he, Battleson, who had first been introduced.

2. The witness was apparently referring to defendant.

in connection with the dope deal, and was not acting as a go-between in the murder conspiracy. On cross-examination, King was asked whether he had heard any discussion of the murder during the first meeting. He stated that he had, but that Agent Battleson had brought up the subject. When asked for defendant's reaction to the first mention of the subject, King stated:

"A. I think the question was, do you know somebody that wants somebody . . . . like killed, you know, or shot, and we said . . . . we said that we knew somebody that had talked about it, but we had no part in it." (Tr. 98)

King also stated that defendant had known Raley previously.

Testifying in his own behalf, defendant admitted that he had been at the first meeting with King, Battleson, Alexander and Miller. He disputed Agent Battleson's testimony as to the first meeting only in that Battleson had incorrectly stated that Raley had been present.[3] As to his conversation with Battleson during that meeting, defendant said:

"He asked me if I was the one that wanted Officer Boyd killed, and I said, 'no, sir, I was not, but that I possibly knew someone who did.'" (Tr. 104)

Defendant later stated on cross-examination that he had been referring to Raley when making this statement. He also testified that he had not personally known Officer Boyd, but that "Officer Boyd was quite well known. I had heard it first . . . I have heard of him from many people." (Tr. 112) Defendant did not testify as to the second meeting except to state that he went at King's request to introduce Raley to the agents; nor did he testify as to the later transaction at Raley's apartment.

■ In his first assignment of error, defendant asserts that the trial court should have given defendant's requested instruction number 2, regarding the law of conspiracy. After examining both defendant's requested instructions and the conspiracy instruction actually given by the trial court, we are convinced that the latter was a fair and adequate statement of the law of conspiracy in Oklahoma. That being so, the court did not err in refusing defendant's requested instruction. See Haywood v. State, Okl.Cr., 513 P.2d 322 (1973). We, therefore, find this assignment of error to be without merit.

■ In his second assignment of error, defendant argues that the evidence warranted an instruction on the defense of entrapment and the trial court's refusal of defendant's requested instruction thereon was erroneous. We disagree for the following reasons: First, defendant's reliance on Shouquette v. State, 25 Okl.Cr. 169, 219 P. 727 (1923), and Crosbie v. State, Okl. Cr., 330 P.2d 602 (1958), is misplaced. In *Shouquette,* for example, this Court reversed a conviction for bank robbery on the grounds that the undercover agent involved, who had planned the robbery and recruited the defendant as a participant, was the "chief moving actor" in the crime. In *Crosbie,* a prosecution for practicing dentistry without a license, we found that the activities of an undercover agent, hired by the Board of Governors of the Registered Dentists of Oklahoma, did not constitute entrapment, as the agent

". . . did not have to use persuasion or inducements to obtain an appointment for dental work . . . .. The intent to violate the statute in question originated in the mind of the defendant . . . ."

In the instant case, despite defendant's assertions to the contrary, the agents were not, in our opinion, the chief instigators of the offense, nor did they perform the major part of the offense so as to require an entrapment instruction on grounds of pub-

---

3. On direct examination, Agent Battleson first testified that Raley had been present at the first meeting. He corrected himself on cross-examination.

lic policy. Even though the agents were the first to broach the subject of the murder at their first meeting with defendant, we feel that they merely afforded defendant the opportunity of entering into the conspiracy. See Dupree v. State, Okl.Cr., 506 P.2d 974 (1973). According to the testimony of all witnesses present who testified as to the conversation at the first meeting, defendant readily replied to Agent Battleson's question that he might know someone who wanted an officer killed, and he just as readily agreed to contact that person (or persons) to meet with the agents later. Further, neither the evidence of defendant's attendance and participation in the second meeting, nor his role in the later transaction at Raley's apartment, lead us to conclude that an entrapment instruction was required by the evidence. Put in familiar language, the evidence simply did not raise a jury question as to either improper inducement on the part of the agents, or as to lack of predisposition on the part of the defendant. Thus, two of the primary ingredients in an entrapment defense are not present. Rather, as in Hester v. United States, 10 Cir., 303 F.2d 47, at page 49:

"  .   .   .   the circumstances point directly to the establishment of a simple opportunity to commit crime with the appellant subjectively mistaking the safety of the circumstances. This is not entrapment. Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413; Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848; Masciale v. United States, 356 U.S. 386, 78 S.Ct. 827, 2 L.Ed.2d 859; Marshall v. United States, 10 Cir., 293 F.2d 561."

The trial court did not err in refusing to instruct on entrapment, and this assignment of error is accordingly without merit.

█  In his third assignment of error, defendant argues that the evidence was insufficient to establish the offense of conspiracy in that it failed to establish the commission of any overt act in furtherance of the conspiracy by one or more of the parties thereto. Defendant bases this argument on the theory that no agreement, hence no conspiracy, was completed until after Raley had inspected the weapon during the second meeting and after Raley had made the drug payment to the agents. Thus, argues defendant, since no overt act after that point was proved by the State, the offense of conspiracy was not established.

In passing upon this proposition, we first note that the statutory elements of conspiracy, as herein charged, are: (1) agreement to commit the crime charged and (2) an act by one or more of the parties to the conspiracy in furtherance of the conspiracy, or to effect its purpose. See 21 O.S. 1971, § 421 and § 423.

A review of the evidence leads us to conclude that both elements were sufficiently established to justify the trial court in overruling defendant's Demurrer to the evidence, as well as his Motion for directed verdict. In this regard we need only observe the statements and actions of defendant and co-conspirator Raley, particularly: (1) defendant's statement at the first meeting that he might know someone who wanted the officer killed; (2) his willing agreement to put this "someone" in touch with an undercover agent posing as the potential killer; (3) defendant's introduction of Raley, the "someone" of whom he had spoken at the first meeting, to the agents at the second meeting; (4) Raley's inspection and approval of the murder weapon; (5) the fact that defendant willingly accompanied the group to Raley's apartment after the second meeting, as well as his discussion with Agent Battleson of the reasons why Officer Boyd's death was desired; and (6) the payment by Raley (accompanied by a nod of approval from defendant) of a quantity of drugs. In our opinion, defendant is incorrect in arguing that the State had to prove an overt act *after* the payment of the drugs at Raley's apartment; rather, from any or all

of the six pieces of evidence listed above, the jury could logically have found the conspiracy, i. e. the agreement plus an overt act in furtherance thereof, existed *before* the drug payment. This, in turn, renders defendant's position untenable and leads us to dismiss the instant assignment of error without further discussion.

██ In his fourth assignment of error defendant contends that the Amended Information upon which the charge against him was based, failed to properly allege the commission of an overt act in furtherance of the conspiracy. We need only note that the Amended Information alleged that defendant and Raley,

" . . . did overtly pay over to said ROLAND E. BATTLESON good and valuable consideration as partial payment for the completion of said act, and by Defendant RALEY proceeding to inspect the weapon to be used in said alleged act."

The Amended Information, thus, properly alleged the crime for which defendant was convicted. We, therefore, find this assignment of error to be without reason.

For all of the above and foregoing reasons, the judgment and sentence appealed from is accordingly, affirmed.