Kathy Bea BLAYLOCK, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–78–262.

Court of Criminal Appeals of Oklahoma.

July 24, 1979.

Lewis Perrault, III, Tulsa, for appellant.

Larry Derryberry, Atty. Gen., Ross N. Lillard, III, Asst. Atty. Gen., for appellee.

## OPINION

BUSSEY, Judge:

Appellant, Kathy Bea Blaylock, hereinafter referred to as the defendant, was charged conjointly with Charles F. Fetter in the District Court, Tulsa County, Case No. CRF–76–2908, with the offense of Conspiracy to Commit Murder, in violation of 21 O.S.1971, § 421. She was tried and found guilty by the jury who fixed her punishment at two (2) years' imprisonment and a fine of One Thousand Dollars ($1,000.00). From said judgment and sentence, the defendant has perfected an appeal to this Court.

The evidence of the State established that in January of 1976, William Grafton, a special agent for the Bureau of Alcohol, Tobacco and Firearms, working in an undercover capacity, met the defendant and Charles Fetter in Tulsa, Oklahoma, where they operated an abortion clinic. He had numerous telephone conversations with either the defendant or Fetter between January and July of 1976, concerning the possible expansion of Fetter's business interests. He received a telephone call from Fetter on the evening of July 10, 1976, at his residence outside of New Orleans, Louisiana. Fetter stated that he had a problem and that he needed some help. On July 15, 1976, he received a telephone call from the defendant. Defendant advised him that she needed to talk to him about the problem and would fly to New Orleans the following morning.

Grafton and special agent Phil Melancon met the defendant at the airport as arranged. She told them that they were having a problem with Dr. Jimmie Toney at the clinic. They were afraid that Dr. Toney would attempt to take over the clinic while Fetter was serving a prison sentence. They had arrived at the conclusion that Toney must be killed. Grafton agreed to perform a service for a fee of $2,500.00 and requested information about the victim. Defendant replied that he, Toney, usually went to his farm in Arkansas on the weekends with his bodyguard and small child. She indicated as far as she was concerned the bodyguard and child could be killed also. She stated that she would mail Grafton the doctor's photograph, a map of the farm, and the fee to him in Louisiana.

The following day, he called the defendant in Tulsa. She stated that they were working on the arrangements and would be getting the items to him as soon as possible. Grafton informed defendant that he needed to talk to Charles Fetter. Fetter called him shortly thereafter. He stated that he and defendant had thought about Dr. Toney for quite awhile and that they were in agreement that he must be killed and removed from the clinic. Several telephone conversations were had between Grafton, defendant and Fetter in the following days.

On August 5, 1976, Grafton called the defendant and asked her about the items she was to furnish. She replied that Fetter had been working on everything but that something had gone wrong. Fetter advised her to not do anything and that he wanted to talk with Grafton. On August 12, 1976, he visited Fetter in the Federal penitentiary in Springfield, Missouri. Fetter told him that they had run the defendant out of the clinic and that he had decided to kill Dr. Toney himself.

Defendant's testimony did not differ substantially from the testimony given by the witnesses of the State. She admitted flying to New Orleans and having a conversation with Agent Grafton concerning the murder of Dr. Toney. She did so at the request of Charles Fetter, her adopted father. Fetter informed her that he had been thinking about having Toney killed, but that he could not go to New Orleans to discuss the matter because of his poor health. He told her that she was to act very tough and was to make inquiries as to the expense and necessary arrangements to facilitate the killing. She obtained the information and reported back to Fetter. Grafton called her several times thereafter inquiring about the money, map and photographs. She put him off at first but finally told him that she did not want to have anything to do with it and that they must talk to Fetter.

■ Defendant asserts in her first assignment of error that the evidence of conspiracy to commit murder was not sufficient to sustain the jury's verdict. She argues that the State failed to prove the existence of an agreement between the parties to commit an unlawful act and that she performed no overt act in furtherance of the object of the conspiracy. We must disagree with both assertions. Agent Grafton testified that the defendant told him that she and Charles Fetter had a problem and that they "have come to a conclusion that he needs to be removed from the office." [Tr. 21–22]. He further testified that Charles Fetter informed him in a telephone conversation that "he and Kathy had discussed this and he had thought about it for quite awhile and that they were in agreement that Dr. Toney had to be killed, had to be removed from the clinic." [Tr. 30]. Special Agent August Palumbo testified that Charles Fetter informed him that he had a telephone conversation; that defendant had acted as his emissary in her meeting with Grafton and that she "helped him make his decision." [Tr. 120]. We find that there was sufficient evidence from which the jury could reasonably conclude that an agreement existed between the defendant and

Charles Fetter to effectuate the murder of Dr. Toney, and this Court will not interfere with the jury's findings, since it is the exclusive province of the jury to weigh the evidence and determine the facts. See *Campbell v. State,* Okl.Cr., 546 P.2d 276 (1976).

■ Having determined that there was competent evidence from which the jury could conclude that an agreement existed between the parties, we must now address the question of whether an overt act was committed in furtherance of the conspiracy. Defendant urges that there was no overt act to effect the object of the conspiracy in that she did not send Agent Grafton the photograph, the map, or the money. The Attorney General counters this argument by urging that the trip to New Orleans to discuss the details about the illegal endeavor constituted an overt act in furtherance thereof. We must agree with the logic of the Attorney General. In *Wright v. State,* Okl.Cr., 535 P.2d 315 (1975) the defendant attended two meetings with a coconspirator to discuss the hiring of a person to kill a police officer we stated:

"In our opinion, defendant is incorrect in arguing that the State had to prove an overt act after the payment of the drugs at Raley's apartment; rather, from any or all of the six pieces of evidence listed above, the jury could logically have found the conspiracy, i. e. the agreement plus an overt act in furtherance thereof, existed before the drug payment. . . . "

We therefore find this assignment to be without merit.

■ The defendant contends in her final assignment of error that "she should have been able to avoid guilt because of her withdrawal from the crime as evidenced by her refusal to provide the items necessary to carry out the murder and the announcement that she would have nothing more to do with the scheme." Inasmuch as we have previously found that defendant's trip to New Orleans constituted an overt act in furtherance of the conspiracy it is of no consequence that she did not supply the

items to Agent Grafton. The jury was properly instructed that abandonment is a defense, but only in such cases wherein the conspirator withdrew from the conspiracy prior to the commission of an overt act.

The judgment and sentence is accordingly *AFFIRMED*.

CORNISH, P. J., and BRETT, J., concur.