THE STATE v. WILLIAM MURPHY, Appellant.—6 S. W. (2d) 877.

Division Two, May 25, 1928.

*Don O. Vernon, L. C. Mayfield* and *Page & Barrett* for appellant.

222

*North T. Gentry*, Attorney-General, and *Claud Curtis*, Special Assistant Attorney-General, for respondent.

WHITE, J.—March fourth, 1926, a jury found the defendant guilty of accepting a bribe, and his punishment was assessed at imprisonment in the State Penitentiary for two years. Judgment was rendered accordingly, and he appealed.

The specific charge against defendant was that on a certain day in November, 1925, while Presiding Judge of the County Court of Laclede County, he corruptly and feloniously made an agreement with one Max Lander, *alias* Milton Lamb, for a consideration of $150, to "cast and express his official vote, opinion, judgment and decision," in his official capacity as Presiding Judge of the County Court of Laclede County, in favor of a proposal of the said Lander in relation to the purchase of certain cabinet safes, described in the indictment, and in pursuance of that agreement the defendant did unlawfully and feloniously accept from the said Lander, *alias* Lamb, the sum of one hundred and fifty dollars as the bribe, etc., and did in the manner agreed upon cast his vote, judgment and decision as presiding member of the county court. The indictment is of great length and set out in two counts, each describing practically the same offense. The indictment was returned by a grand jury in Laclede County. A change of venue was awarded on the application of defendant to Wright County, where the case was tried.

The circumstances giving rise to the prosecution were these: Homer Davenport, Probate Judge of Laclede County, went to St. Louis to the Secret Service Agency of E. H. Hargrave for the purpose of consulting Hargrave regarding supposed graft in the County Court of Laclede County. He met Mr. Hargrave and subsequently had correspondence with him, with the result that a detective was sent out from St. Louis to be paid ten dollars and expenses for his work. Later Max Lander came to Lebanon from St. Louis and registered at the hotel as Milton Lamb. He had an interview with Davenport in regard to the purpose of his coming, and Davenport prepared him by putting in his possession $150 in marked bills.

Three safes owned by Laclede County were for sale. The new court house had been provided with vaults so that safes were no longer needed; the case turned upon negotiations for the sale of those safes.

Max Lander testified for the State that he arrived in Lebanon November 5, 1925. He went to the court house and met the county collector and county clerk, and was introduced to the judges of the county court. He told the judges of the county court that he understood some safes were for sale, and at his request they showed them to him. The price which the judges had fixed upon the safes was about $1360, being the original cost price with twenty-five per cent off. Lander said that he would have to think the thing over and probably would make an offer.

After Lander had finished his conversation with the judges and had started away, Judge Murphy said something which caused him surprise, to the effect that he (Murphy) "could fix this deal for me at my price." That night Lander telephoned to Murphy, who lived several miles in the country, and said, relative to the little conversation about the safes, that he was in a hurry to leave Lebanon and would like to talk it over that night. Murphy assented. Lander hired a taxi and started to Murphy's place in the country, but on account of bad roads he turned back. The next morning before he got up Murphy came to his room in the hotel, talked about the safes a while, and said: "Now, let's get down to business; if I can swing this deal for you how much money will you give me?"

Lander considered a while and told him $150. Murphy asked: "Can you have it in cash?" Lander answered, "Yes." Murphy said: "No check." Lander replied: "All right, I will have it in cash."

Then it was agreed that Lander should come to the court room and make an offer of $850, and stand pat on his offer, and Murphy was to talk the other judges over. In another conversation with Murphy, Lander agreed to be in the court room at three o'clock in the afternoon to make his offer. Lander came late, but when he got there he held several conversations with the judges. They then talked together in the vault and when they came out Judge Murphy asked a thousand dollars for the safes. Lander would not go higher than $850. Murphy said the offer was accepted. Lander gave two checks signed "Milton Lamb" on two different banks in St. Louis, aggregating the $850. He took a receipt and then started for the hotel. Murphy said he would drive Lander down town. The two got in Murphy's car and after they had got a short distance from the court house Murphy said:

"Well, that's fine. That is all fixed up nice. I had a heck of a time with those other fellows, especially Judge Robinson, but I told

Judge Robinson there was a cash cut in this for him, and I told him that I was getting a cash cut on the side, he fell for that and then it was easy to talk over the other bird.''

When they got to Lander's room he paid Murphy the one hundred and fifty dollars in marked bills. They then went down stairs where Lander gave a signal to the sheriff, indicating that the money had been paid. Murphy was immediately arrested. When asked if he had any money he said he had about thirty-five cents, opened his purse and showed it. Asked if that was all, he said it was. He·was searched and the one hundred and fifty dollars was found in his pockets.

Murphy's defense was that after the sale he went to Lander's room to take a drink with Lander, that Lander told him he had been so nice he was going to give him $150, and although he protested, Lander shoved the money into his pocket. Then they went down stairs and the officer found it on him.

I. Defendant first complains that the court erred in overruling his application for a continuance. He sets up that five witnesses, Edward Hargrave, Claude Davis, Willie Goodwin, Minnie Darrow and J. M. Woods, were absent. For diligence the affidavit shows that he had subpoenas issued in Laclede County, with a return stating that the witnesses had not been found.

The State filed a counter-affidavit stating that subpoenas were not issued for Hargrave until February 25th, and for the other witnesses February 20, 1926. The matter was brought up March 2, 1926.

Hargrave was the manager of the Hargrave Secret Service Agency in St. Louis. The affidavit stated that he would testify to that fact, and that he talked over the matter with Max Lander, *alias* Milton Lamb, before he went to Lebanon to direct how to effect the scheme against the defendant. This testimony, if offered, was entirely irrelevant and superfluous. The State showed that Lander went to Lebanon for the very purpose of investigating the situation relating to supposed graft in the county court. The question at issue was whether the defendant voluntarily sought the bribe in order to make the sale of the safes. The original plan for the investigation would cut no figure.

As to the other witnesses the application said that Willie Goodwin, if present, would testify to the whereabouts of the defendant at some time during the day on which the trade was made, but not at the time when the defendant went to Lander's·room at the hotel. That Minnie Darrow would testify to a conversation between Lander and defendant about going up to Lander's room· to take a drink.

The counter-affidavit shows that a subpoena was issued for each of these witnesses on February 20th. That .Minnie Darrow had

gone to Springfield a short time before, and that the defendant knew her address there on the 24th of February. That Willie Goodwin had moved to the State of Colorado, a matter of which the defendant was informed, and no effort was made to take his deposition or procure his testimony in any way. The court in overruling the application found that there was no diligence shown as to those two witnesses, even if their testimony was competent.

The application says that Claude Davis, if present, would testify as to some charges against the defendant in regard to receiving money from other persons—a matter relating entirely to other cases and complaints against the defendant, not brought into this case at all.

The application states that William Wood, if present, would testify that Max Lander, or Milton Lamb, had no money in the banks on which he drew the checks. That testimony was entirely irrelevant. We consider the subject in Paragraph III, below.

The granting of a continuance, especially as to the matter of diligence in the procuring of witnesses, is largely within the discretion of the trial court. We do not find in this case that the discretion of the trial court in overruling the application for continuance has been abused. [State v. Wade, 270 S. W. 298; State v. Tracy, 294 Mo. 1. c. 380.]

II. It is next claimed that the evidence is insufficient to support the verdict because the defendant was entrapped into the act of which he was accused. The question of entrapment frequently has been before the courts for discussion.

It was said by this court in State v. Chappell, 179 Mo. 324, 1. c. 332: "The mere fact that a person is solicited or encouraged in the commission of an offense furnishes no defense, in event he yields to such solicitations and actually perpetrates the crime."

Where two or more persons conspire to commit a crime, and the person against whom the crime is premeditated becomes apprised of the intention, and arranged to have them apprehended in the act, he does not thereby assent to their conduct nor furnish them any excuse.

In Ritter v. United States, 293 Fed. (C. C. A.) 187, on the question of entrapment it was said (1. c. 189):

"Public policy forbids that officers sworn to enforce laws should seek to have them violated. . . . So that, when an officer induces a person, who has had no intention of committing a crime, to violate a law, courts will not lend their aid in punishing the person thus lured into crime."

That states the principle upon which defendants in entrapment cases are held not guilty. It is quoted from an older case, and the

quotation continues: "The idea of the law is, however, that a man who has engaged in unlawful business may have an opportunity, and the Government officers may afford him an opportunity, to commit a crime. If a Government officer goes into a place, asks for a drink of whiskey, and it is given to him upon his solicitation, convictions based upon such evidence are frequently sustained." [See State v. Feldman, 150 Mo. App. 120; State v. Seidler, 267 S. W. (St. L. Ct. App.) 424; United States v. Certain Quantities, Etc., 290 Fed. 824, l. c. 827; Luterman v. United States, 281 Fed. 374.]

The distinctions seem to be well defined. If a person is induced by anyone to commit a crime for the purpose of securing a conviction, the conviction will not stand. But if the purpose to commit the crime is in the mind of the defendant at the time, or suggested by him, defense of entrapment will not avail. Officers or other persons may make an opportunity for one to commit a crime for the purpose of securing a conviction and a conviction so obtained will be upheld if the criminal intent originated in the mind of the accused. In the present case the detective was provided with money for the purpose of investigating graft in the county court. Apparently he did not know what judge of that court, if any one of them, was susceptible to bribery. The old safes of the county were on hand and for sale. That was suggested to him as a means for making his investigation. After conferring with the judges of the county courts about the purchase of the safes, Murphy said he could "fix this deal for me at my own price." This was a surprise to Lander; a suggestion coming from the defendant himself. They failed to have a conference that night, but the next morning before Lander was up, Murphy came to his room: "Now let's get down to business; if I can swing this deal for you how much money will you give me?" Thereupon the deal was made. There could hardly be a plainer case where the initiative was with the party charged. The detective simply furnished the opportunity for him to commit the crime. It was clearly not a case of entrapment which would excuse the defendant.

III. It is claimed further that there was no real sale, and therefore the bribe was not given for the purpose of inducing the sale; that there was no intent to sell.

Even if that were a defense it would not avail here. There was an actual sale. While Lander signed two checks in the name of Milton Lamb, he said it was a name that he often used in his business, and his checks had been cashed in that name. The contract was complete because the county court accepted his checks in payment for the safes. It was a contract which the county court could have en-

forced against him, even though there was no money on deposit to meet the checks. There was no evidence to show that he was insolvent and unable to respond in an action for the purchase price. After the arrest the checks were taken ,up, Lander said, because he didn't want those safes on his hands. It was a time of excitement, and the natural construction of the situation would be that the sale was impliedly rescinded.

IV. Defendant offered evidence which the court excluded, tending to show the value of the safes. The evidence was irrelevant. It would not matter whether the safes were sold for the actual value or more or less. The only question was whether the defendant received a bribe for voting for and inducing the sale.

V. It is claimed further that error was committed in submitting the case to the jury on two counts, each charging a felony. There was no motion to elect, and besides each count charges exactly the same offense. There was no error in that. [State v. Brown, 296 S. W. 125, l. c. 127.]
We are unable to discover any error in the record.
The judgment is affirmed. All concur, *Walker, J.,* in the result.