Ira Q. BEASLEY, Plaintiff in Error,

v.

STATE of Oklahoma, Defendant in Error.

No. A–12110.

Criminal Court of Appeals of Oklahoma.

March 30, 1955.

———————◆———————

Appeal from the Superior Court of Comanche County; Robert S. Landers, Judge.

Ira Q. Beasley was convicted in the Superior Court of Comanche County for the crime of accepting a bribe, and was sentenced to serve a term of one year and one day in the penitentiary. Reversed and remanded for a new trial.

John W. Tyree, Lawton, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

JONES, Presiding Judge.

The defendant, Ira Q. Beasley, was charged by an information filed in the Superior Court of Comanche County with the crime of accepting a bribe, 37 O.S.1951 § 7, allegedly committed on August 15, 1953, was tried, convicted and pursuant to the verdict of the jury was sentenced to serve a term of one year and one day in the penitentiary and has appealed.

Complaint is made of instruction number four and that presents for determination on appeal of the single question as to whether a conviction can be upheld in a case where one who desiring to entrap another into the commission of a crime for the personal benefit of the entrapping person lures the accused, who is otherwise an innocent person, into the commission of a crime, when the entrapping person was not acting as a decoy for officers at the inception of the transaction, but where the officers were later advised by the entrapping person of the negotiations leading up to the commission of the alleged crime and were present at the time of its commission. The answer is no.

The defendant, a Negro police officer in the City of Lawton, was arrested by the chief of police who was hidden in a barn and watching the transaction when Carl Bullard, an admitted bootlegger, gave the defendant $65 in marked money for the alleged purpose of being allowed to sell whiskey at Bullard's place of business which happened to be in the area patrolled by the defendant. It is admitted that neither the chief of police nor any other officer had knowledge of the alleged bribery transaction until the evening before it was committed. All of the preliminary negotiations were between the bootlegger Bullard and the accused. The pivotal question for determination was the question as to who initiated the proceedings leading up to the alleged bribery.

Bullard testified for the State that he was wholly unacquainted with the defendant prior to August, 1953; that along about August 1, 1953, when Bullard returned home, he learned that a party had called for him twice and left a telephone number for him to call. That pursuant to this information he called the telephone number and talked to the defendant who identified himself as the police officer who had charge of patrolling the neighborhood where Bullard was selling whiskey. In the conversation, according to Bullard, the defendant asked Bullard to come over to the defendant's house as defendant wanted to see him. Bullard drove by defendant's house but not seeing defendant's automobile at the house did not stop. A few days later defendant called Bullard and made arrangements to meet him at the L. O. Ranch. Bullard then contacted Mike

Hennessee who was a distant relative of the chief of police, Ralph Hennessee. At the appointed time and place Mike Hennessee, J. S. Woods and Charlie Hennessee were hidden in the barn at the L. O. Ranch and heard the conversation between Bullard and the defendant. In that conversation defendant told Bullard that it would cost him $65 per month for protection in order to sell whiskey. Afterward Bullard, Mike Hennessee, J. S. Woods and Charlie Hennessee discussed the matter and decided to try to entrap the defendant for the purpose of having him discharged from his job as policeman so that Charlie Hennessee could be appointed in his place. The substance of Bullard's testimony was that it was not his intention to try to get the goods on Beasley so that he could be prosecuted, but only so that Mike Hennessee could report the matter to the city council for the purpose of having defendant Beasley discharged from his employment. On the evening before the alleged payment of the bribe money was to be undertaken, the chief of police was contacted for the first time and told that one of his patrolmen was attempting to extort money from Bullard under the guise of selling protection. Thereafter the chief of police handled the transaction. He and his chief of detectives prepared $65 and recorded the serial numbers on the bills so that they could later be identified. After the money had been furnished to Bullard, Bullard notified the accused that he would pay him the $65 at the L. O. Ranch barn. The chief of police together with the chief of detectives and Mike Hennessee concealed themselves in the barn at the time the payment was made to Beasley and he was promptly arrested by the chief of police.

Mike Hennessee, J. S. Woods and Ralph Hennessee, the chief of police, in corroboration of Bullard testified to substantially the above facts.

On behalf of defendant the accused testified that he had been recently honorably discharged from the United States Army after serving for 20 years; that during part of the time of his enlistment in the Army he had served as a military policeman. He specifically denied that he ever called Bullard and proposed the payment by Bullard of protection money to him, but on the contrary testified that Bullard called him and proposed to pay $65 a month protection money to him. That he agreed to meet Bullard at the L. O. Ranch barn to accept the bribe money with the intention on his part to arrest Bullard for giving a bribe to an officer just as quickly as the money was paid. He said the chief of police stepped from in hiding and arrested him just as soon as Bullard handed him the money and thus prevented the accused from arresting Bullard.

The trial court gave the following instruction over the objection and exception of the defendant:

"The defendant has interposed as one of his defenses, the defense of Entrapment. And in this connection, you are instructed that if you believe from the evidence that the officers, or those acting under them, first suggested the commission of the criminal act, or did first lure the accused into the commission of such acts, then and in that event, it will be your duty to hold for the defendant and acquit him.

"However, if you believe from the evidence that the first suggestion for the commission of the crime came from the defendant and that all of the essential acts constituting the crime were done by him, then the fact that the officers, or those acting under them, furnished an opportunity and lent aid in the commission of the offense less than the performing of some essential act constituting the offense, then, and in that event, the defense of entrapment would not apply."

This instruction is correct as an abstract statement of the law and has been upheld in many cases in Oklahoma where officers or those acting as decoys for them were allegedly involved in the initial steps leading up to the commission of the purported crime. Shouquette v. State, 25 Okl.Cr. 169, 219 P. 727; Warren v. State, 35 Okl.Cr. 430, 251 P. 101; Finley v. State, 84 Okl.Cr. 309, 181 P.2d 849; Rider v. State, 53 Okl.Cr. 393, 12 P.2d 552. The complaint of the accused is directed at that portion of the instruction which limited the defense of

entrapment to instances where officers or those acting under them first suggested the commission of the criminal act and it is contended by the accused that the instruction should have read: "'You are instructed that if you believe from the evidence that the entrapping person first suggested the commission of the criminal act or did first lure the accused into the commission of such acts, then and in that event it would be the duty of the jury to acquit the defendant."

The question presented is one of first impression in this state. Although there have been one or two cases where the initial transaction was between the accused and an entrapping person not acting as a decoy for the officers, the precise question here presented was not an issue in those cases. Rider v. State, supra, and Finley v. State, supra.

The rule adhered to in Oklahoma is set forth in Lee v. State, 66 Okl.Cr. 399, 92 P.2d 621:

"Entrapment is the planning of an offense by an officer, and his procurement by improper inducement of its commission by one who would not have perpetrated it, except for the trickery or fraud of the officer.

"Ordinarily, it is not against public policy for peace officers or persons acting under their direction to set a trap for one suspected of planning the commission of a crime, and if he commits the crime, even though encouraged by the officers or persons acting under their direction who laid the trap, the fact that he was so entrapped will be no defense."

ιn Burdick's The Law of Crime, Vol. 1, § 195 it is stated:

"That one is caught in the commission of a crime merely because some trap is laid for his detection and capture is, in itself, no logical reason for holding him irresponsible. The marking of money, or intentionally leaving it exposed in case of a suspected or anticipated robbery or larceny, or setting a watch for criminals, or leaving open a door so that an expected thief may more easily get into a house, or in other ways merely providing facilities for the commission of a crime, furnishes no defense for the offender.

" 'Entrap' means, literally, to ensnare, to catch in a trap, but 'entrapment,' as the term is now usually employed in the law of crime, means inciting, inducing, or instigating one to commit a crime not originally contemplated by him, for the purpose of entrapping him in its commission and institiuting criminal prosecution against him. The mere furnishing of opportunity to another who is ready and willing to commit the offense is not such entrapment, * * *.

"Many 'entrapment' cases are connected with improper inducements made by law enforcement officers to entice one to violate the law, for the purpose of arresting and prosecuting the violator. Such despicable acts are often motivated by desires for fees and 'efficient' records, but, as a rule, they have deserved and received denunciations from the courts, and have been recognized as constituting a defense on the ground of public policy.

"Artifice and stratagem may lawfully be employed to catch those engaged in the commission of crime, but it is a different matter when the criminal design originates with an officers of the law, and he incites an innocent person, or any one not contemplating an offense at the time, to commit a crime in order that the officer may prosecute."

In Finley v. State, supra [84 Okl.Cr. 309, 181 P.2d 860], this court stated:

"Here, the jury believed the request for the payment of the bribe originated with the defendant which Ruth Fugatt reported to the County Attorney, who then used her as a decoy, that Finley might consummate the proposed crime. This court has held that a decoy may be used to detect a criminal, by giving him an opportunity to commit the intended offense, and the decoy may be present and apparently assist in its commission and such conduct on the part of the decoy is no defense. For this rule to

apply, however, the suggestion of the criminal act must originate with the defendant. If the decoy suggests or initiates or induces the commission of the crime, or artificially propagates the crime or lures an otherwise innocent person to commit the crime and the decoy performs an act essential to the crime, a conviction cannot be had on such a basis for that is entrapment."

In Rider v. State, supra [53 Okl.Cr. 393, 12 P.2d 554], without elaboration or discussion of the distinction, if any, between a decoy acting for himself or acting for officers, this court held:

" 'A decoy may be used to detect or entrap a criminal, and as such may afford an opportunity for a criminal to commit a crime, and may be present apparently assisting in the commission of a crime, and such action on the part of the decoy will not constitute a defense. But, when the decoy first suggests, initiates, or induces the commission of the crime, or, as it sometimes said "artificially propagates" the crime, and thereby lures an otherwise innocent person to aid and abet him, or where the decoy himself does some act essential to the crime charged, a sound public policy will not uphold a conviction.' "

In both Rider v. State and Finley v. State the initial transaction was between the accused and the alleged entrapping person and the initial transaction was wholly without knowledge of the officers who did not enter into the transaction until their attention had been called to the initial occurrences by the entrapping person. The Rider case which involved the larceny of domestic animals was reversed while the Finley case was affirmed and was similar in many aspects to the instant case as it involved the payment of an alleged bribe to Finley by the decoy, Ruth Fugatt. In that connection it should be pointed out that the cases involving entrapment distinguish those cases where individual, personal and property rights are primarily involved and cases where the public welfare is affected. The cases of larceny and burglary affecting primarily the property rights of an individual fall within the first class while the crime of bribery of a

public official falls into the second category. 18 A.L.R. 152; 66 A.L.R. 483; 86 A.L.R. 266.

Also, the above annotations discuss the distinction in principle between measures used to entrap a person into crime in order, by making him a criminal, to aid the instigator in the accomplishment of some corrupt private purpose of his own, and artifice used to detect persons suspected in being engaged in criminal practices.

In the instant case the accused contended that the alleged bribery transaction was initiated by Bullard acting in a conspiracy with Mike Hennessee, J. S. Woods and Charlie Hennessee to entrap the accused in order to get him discharged from his employment and thus serve their private purpose of having him replaced by Charlie Hennessee who in turn would permit Bullard to sell whiskey. If the jury had believed this evidence of the accused and had accepted this theory, he would have been entitled to an acquittal. That the jury did not fully understand instruction number four hereinabove quoted is disclosed by the record of the proceedings had when the jury returned to the courtroom after they had commenced their deliberation and asked the court to more fully explain instruction number four involving entrapment to them. The foreman of the jury made this statement: "We don't know if this entrapment has to be arranged by law enforcement officers to be an entrapment." The court then advised the jury by reading from said instruction and further adding, "In other words, that they caused the person to commit the crime; they would have to suggest it to him or lure him or cause him to commit the crime." The foreman then asked, "They have to be officers?" and the court then stated that the officers or persons acting under their authority or operating in conjunction with them would have to have first suggested the criminal act before it would have been entrapment. There were questions from other jurors which plainly indicated that they were troubled by the question as to whether or not it would constitute entrapment if they found that Bullard initiated the transaction although not

acting under direction or with the knowledge of the officers. The general rule is stated in 22 C.J.S., Criminal Law, § 45a as follows:

"One who is instigated, induced or lured by an officer of the law *or other person, for the purpose of prosecution,* into the commission of a crime which he had otherwise no intention of committing may avail himself of the defense of 'entrapment.' Such defense is not available, however, where the officer or other person acted in good faith for the purpose of discovering or detecting a crime and merely furnished the opportunity for the commission thereof by one who had the requisite criminal intent."

There are cases which hold that the defense of entrapment is good even in a bribery case where the evidence shows that an otherwise innocent person was induced to accept a bribe by the entrapping person who first initiated the proceedings leading up to the payment of the alleged bribe. State v. Dudoussat, 47 La.Ann. 977, 17 So. 685; Lunsford v. United States, 10 Cir., 200 F.2d 237; State v. Dougherty, 86 N.J.L. 525, 93 A. 98; Gargano v. United States, 5 Cir., 24 F.2d 625; Sabbatino v. United States, 2 Cir., 298 F. 409; State v. Murphy, 320 Mo. 219, 6 S.W.2d 877.

It is our conclusion after a careful study of available authorities that although instruction number four was correct as an abstract statement of law, it was not applicable to the contention of the accused. Of course under the evidence of the State there was no entrapment because the alleged crime first originated in the mind of the accused and Bullard and the officers who later came into the transaction merely afforded him an opportunity for carrying out the purported crime. However, if the testimony of the defendant had been believed by the jury, and it is evident from the questions directed at the trial court by the jurors that some of them believed that the crime originated in the mind of Bullard and not in the mind of Beasley, the defendant would have been entitled to his acquittal.

We further conclude that the theory of entrapment would not be an issue and the accused would not be entitled to an instruction on entrapment where the initial transaction was by an alleged entrapping person and no officer was ever notified of the entrapment before the crime was committed. If this were not the rule, we can foresee that in many cases where two or more individuals are charged with a crime, one or more could assume all blame for the commission of the crime while another with the cooperation of his accomplices could claim he was "framed" and "entrapped" by his confederates into committing the crime. Accordingly before entrapment may be presented as a legal defense, the evidence must establish that the officers, although not necessarily parties to the initial proceedings, must have been fully informed of the purported commission of the criminal act before it was committed.

Upon the retrial of this case instruction number four should be corrected to read as follows:

"The defendant has interposed as one of his defenses the defense of entrapment. And in this connection, you are instructed that if you believe from the evidence that the officers, or persons acting under the direction of the officers, or any other persons with a corrupt private purpose to serve, first suggested the commission of the criminal act, or did first lure the accused into the commission of such acts, he being an otherwise innocent person, then and in that event, it will be your duty to hold for the defendant and acquit him.

"However, if you believe from the evidence that the first suggestion for the commission of the crime came from the defendant and that all of the essential acts constituting the crime were done by him, then the fact that the officers, or other persons, furnished an opportunity and lent aid in the commission of the offense less than the performing of some essential act constituting the offense, then, and in that

event, the defense of entrapment would not apply."

For the reasons hereinabove stated, the judgment and sentence of the Superior Court of Comanche County is reversed and remanded for a new trial.

BRETT and POWELL, JJ., concur.