**John Roy SAVAGE, Plaintiff in Error,**

**v.**

**The STATE of Oklahoma, Defendant in Error.**

**No. A–12335.**

Criminal Court of Appeals of Oklahoma.

Oct. 24, 1956.

Rehearing Denied Dec. 5, 1956.

Matt S. Simms, Sand Springs, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Owen J. Watts, Asst. Atty. Gen., for defendant in error.

POWELL, Judge.

The plaintiff in error, John Roy Savage, hereinafter referred to as defendant, was charged in the district court of Tulsa County by information with the sale of "15,169 grains of Positive, Manicured, High-grade Marihuana for smoking purposes", to one Robert Grimes for the sum of $475 cash, said sale being on July 26, 1955. Defendant was tried before a jury, found guilty and his punishment assessed at six years confinement in the Oklahoma State penitentiary.

Two propositions are argued: (1) That the trial court erred in giving Instruction No. 5 and in not clearly instructing the jury on the defendant's theory of defense; and, (2), That the sentence should be modified in that it is excessive and influenced by passion and prejudice.

A study of the evidence in some detail seems called for, and for the State is hereinafter summarized.

Glenn H. Brown, the sheriff of Tulsa County, testified substantially as follows: That on or about the 20th day of July, 1955, an informer by the name of Harry McCarthy of Tulsa County came to his office and asked if he was interested in catching some marihuana, and turned over a small jar of substance to him, which the sheriff later had analyzed by the State Laboratory and found the same to be marihuana. As a result of the test, the sheriff called in Mr. Westover and Mr. Mosely of the Division of Regulated Drug Enforcement under the Attorney General, for assistance in the case; that on July 25, 1955 Mr. Westover and Mr. Mosely came to the sheriff's office in Tulsa with one Robert Grimes, who was to be used as a decoy in the further investigation of the case. On July 26, $475 in money was counted out and the serial numbers of same registered, put in the sheriff's safe and later that evening given to Robert Grimes for the purpose of the purchase of marihuana from the defendant.

John Harlin, a deputy sheriff of Tulsa County, corroborated the sheriff and was present when the serial numbers from the $475 in currency were taken off and written down and when the money was turned over to Mr. Grimes on the evening of July 26. Mr. Harlin, M. M. Leavell, a deputy sheriff, and John Henderson of the Tulsa Police Department then proceeded to the Union Depot where Mr. Harlin and Mr. Henderson went inside and Mr. Leavell remained on the outside. On entering the depot Mr. Harlin saw Grimes in the waiting room of the depot, and shortly thereafter Grimes got up and walked into the rest room. That witness saw the defendant come in and that he walked over to the rest room. That when the defendant came in the depot he did not have anything with him. That shortly after entering the rest room, defendant came out and went out of the depot at the east entrance, and immediately returned, carrying a little bag and again entered the rest room where Grimes was waiting. Soon thereafter Grimes and the defendant came from the rest room into the depot proper, and officer Harlin arrested the defendant and searched him, and found the $475 in marked money in his right front pocket. The money was later checked and found to be the marked money given to Grimes in the sheriff's office earlier in the evening. Witness testified that when Grimes came out of the rest room he had the small bag which the defendant had taken into the rest room in his possession.

M. M. Leavell, deputy Sheriff, corroborated the sheriff and officer Harlin and stated that he parked at the east entrance of the depot and saw the defendant drive up and park about 9 P.M. The defendant then entered the depot and stayed about five minutes and came out again and went to his car, picked up a small tan canvas bag and took it back into the depot. Mr. Leavell followed the defendant into the depot proper and saw him go into the rest

room with the small brown bag, and later assisted in the arrest of the defendant.

Arnold Mosely, agent, Division of Regulated Drug Enforcement of the Attorney General's office also corroborated the foregoing witnesses and testified substantially as follows: That he wrote down the serial numbers of the $475 in bills and that five minutes before nine o'clock the evening in question he searched Grimes in the sheriff's office and that at that time Grimes did not have any narcotic drugs or money on his person. Mr. Mosely then delivered the $475 to Grimes and immediately took him to the Union depot. Mr. Mosely entered the depot and left Grimes outside in the custody of Mr. Westover and undersheriff Joe Madison. About five minutes later the defendant entered the depot and sat down on a bench where Grimes was located and had a short talk with Grimes. That the defendant did not have anything with him at that time. The defendant, after about five minutes, left the depot and in three or four minutes returned with a brown, canvas zipper bag in his hand which Mr. Mosely recognized, as he had prior to that time given it to Mr. Grimes. The defendant and Grimes then walked into the men's rest room and private toilet, followed a short distance behind by witness Mosely. After they stayed in the private toilet about a minute or two they came out and the defendant did not have the brown bag. As they entered the depot proper they were both placed under arrest and Mr. Westover took possession of the brown bag, which was in the possession of Grimes.

H. B. Westover, Chief of the Division of Regulated Drug Enforcement of the Attorney General's office corroborated Mr. Mosely in practically all of his testimony. Mr. Westover took possession of the brown bag after the arrest of the defendant and Grimes, and later turned it over to Taylor Rogers, State Chemist of the Department of Public Health of the State of Oklahoma, and also took possession of the $475 and placed it in the safe in the Attorney General's office at Oklahoma City. Mr. Westover further testified that he and Mr.

Mosely gave the brown bag, which was empty, to Grimes that afternoon in the sheriff's office. The witness further testified that he talked to the defendant on the night of July 26 in the sheriff's office and that the following transpired:

"Q. Will you relate to the jury that conversation? A. I talked to him about where he got this marihuana from and he stated that he got it at a lake south of Topeka, Kansas, and he brought it to Tulsa and buried it down in the river bottom and I said, 'What do you mean by river bottom?' and he said, 'The Arkansas River'.

"Q. Is that what he said as to where he got it? A. That is right.

"Q. Did he say anything else? A. He said that was all he had. I asked him did he have any more and he said 'That is all I got.'"

Robert Grimes in a general way corroborated all of the foregoing witnesses and testified that on the afternoon of July 26, 1955, he met Harry McCarthy in the sheriff's office and that he and McCarthy then drove to a filling station on Eleventh Street in Tulsa where they met the defendant and McCarthy introduced defendant to witness as a man from St. Louis who was interested in the purchase of some marihuana. The defendant at that time told Grimes that if he needed a bigger supply that he could get it for him; that there was no limit to what the defendant could furnish Grimes. Grimes gave the brown bag to the defendant and made arrangements with the defendant that he would meet him at the Union Depot at 9:15 P.M., as Grimes was going back to St. Louis at 9:45 P.M. He testified that he met the defendant in the depot and that defendant did not have the marihuana with him at that time, but told him it was out in his car and that he would go get it. The defendant then left the depot proper and came back in about five minutes and they met in the men's rest room and private toilet and Grimes paid the defendant $475 and the defendant then gave the bag of marihuana to Grimes.

Roger Taylor, State Chemist of the Oklahoma State Health Department testified that he had been working for the State for 28 years, and that the brown bag and contents thereof were turned over to him by Mr. Arnold Mosely and that he later performed a duquenois test on the substance in the brown bag; that there were over two pounds or 15,169 grains of substance in the bag and that after a microscopic test he ascertained that the same was "Positive, Manicured, High-grade Marihuana, free from seeds, stems and other debris."

It will be noted that the State did not call the informer, Harry McCarthy, as a witness. And it will be noted hereinafter that neither did the defense.

The defendant John Roy Savage testified in his own defense. He said that early in the month of July, 1955 he accidently met on the streets of Tulsa one "Big Mac", whose real name was Harry McCarthy and whom he had known some time in the past. That after a short conversation they went their respective ways, but about one week later "Big Mac" stopped defendant on East Eleventh Street, Tulsa, and told defendant that he wanted to talk with him some time, and witness asked McCarthy what he wanted to talk about, and McCarthy replied that he had a little deal witness might be interested in. Defendant testified that he replied: "No, Mac, I don't think that I would. I am working out here and getting along pretty good, and I am getting in 40 hours and supposed to get in over-time later", He said that Mac asked him where he lived, and he told him.

It was developed that the informer, Harry McCarthy, had for a long time been in the illegal whiskey business in Tulsa, and we take judicial notice that Harry McCarthy of Tulsa has perfected appeals from liquor law violation conviction to this court in three cases. Also that the record here discloses that the defendant has never been convicted or investigated before for violation of the laws against narcotics, although it was brought out that he did have one previous conviction for violation of the liquor laws.

Defendant testified that a few days after the second meeting with Harry McCarthy he came to defendant's home and said that he had "a little deal" with a man he had connections with in St. Louis, and he wanted to know if defendant would be interested. Defendant said that he told McCarthy, " 'I do not know', and Mac said, 'You can make a little something for yourself', and I said, 'I don't know, I will have to think about it.' " That defendant came back to see him four or five days or a week later and asked him if he would be interested, and defendant testified: "I told him, 'I don't know, Mac', and he said, 'I have a package of some tea and I don't want him to know it is coming from me and it would be a big help to me in the future doing business with the man, so far as getting cordials and Scotches that are hard to get.' " Defendant said that he finally agreed to help McCarthy and later McCarthy told him that his representative from St. Louis was coming down and that if defendant would go along with him that he would give him $100, and that way they would not know in St. Louis that he, McCarthy, had anything to do with it; that he was doing it as a favor and that it would be two or three days. That McCarthy said that when the time came he would notify defendant and would leave the tea [marihuana] in his car along with a note telling him what to do.

Defendant said that he worked on his job with Public Service on July 26, 1955, and left at 4:30 P.M., and that when he got to his car that he found the windows rolled up and the car locked, and the package lying on the floor board by the front seat, and a little note lying by the accelerator pedal, and that the note said that his man was in and to meet him around 6 o'clock on East 11th at the DX filling station just this side of Harvard or Yale. Defendant said that he went home from work, cleaned up, changed clothes and went out to the filling station and in a few minutes McCarthy drove up and he had Bob Grimes with him, whom he introduced to defendant as his man from St. Louis, who had come

to pick up the package. That defendant said "all right", and asked if the package was to be picked up then, and that McCarthy replied: " 'No, I don't think you want it now, do you?' and he [Grimes] said 'No, I would rather have it around 9 o'clock or a litttle after', and Mac said, 'It would be $475', and I said 'All right.' "

Defendant said that as he started to leave McCarthy said, " 'Do you have anything to put it in?' and I said, 'No, just the package,' and he said, 'Take this' ", and gave defendant a canvas bag and directed defendant to put the marihuana in that bag and give it to Grimes between 9 and 9:15 at the Union Station, which was just prior to the departure of the St. Louis train. He said that the testimony of the officers as to what happened at the Union Station was substantially correct. On cross-examination defendant was asked what he thought the word "tea" used by McCarthy meant, and he said, "Under the circumstances, I was not giving it much attention". He said that he did not know what kind of "tea" it was and did not care. Asked if he knew the "tea" was a form of narcotics, he replied, "I never looked at it from that standpoint." He said that he was very satisfied with the whole arrangement for $100. Defendant admitted that he told the officers that he got the marihuana at Topeka, Kansas, in order to protect McCarthy.

Guy Scott, a barber, was offered as a character witness by the defense but was unable to qualify to testify as to defendant's reputation.

■ Considering defendant's proposition one, that the trial court erred in giving Instruction No. 5 and in not clearly instructing the jury on defendant's theory of defense, we quote the instruction:

"You are instructed that the defendant relies on the defense of entrapment, and you are instructed that to constitute the defense of entrapment you must find that the acts constituting an essential element of the alleged offense were instigated by officials or persons acting under their direction, and the test of criminality is, did the officers or those acting under them first suggest the commission of the criminal act, or lure the accused into the commission of such acts or perform any of the essential acts constituting the offense? You are instructed that if you find that the officials or persons acting under them first suggested the commission of the criminal act or lured the accused into the commission of the criminal act charged in the information then this would constitute entrapment and be a defense.

"You are further instructed that if you find that the first suggestion for the commission of the crime came from the defendant, and all of the essential acts constituting the crime were done by him, then the fact that the officers or those acting under them, for the purpose of entrapment, furnished an opportunity and lent aid to the commission of the offense less than the performing of some essential act constituting the offense, or were present when and apparently assisting in the commission of the crime, constitutes no defense of entrapment."

The question involved has been before this court many times, and the above instruction has been many times approved. See cases cited in Beasley v. State, Okl.Cr., 282 P.2d 249, 251; and generally see 86 A.L.R. pp. 264, 269; 15 Am.Jur. p. 24, § 335; Warren v. State, 1926, 35 Okl.Cr. 430, 251 P. 101; Rider v. State, 53 Okl.Cr. 393, 12 P.2d 552; Lee v. State, 1939, 66 Okl.Cr. 399, 92 P.2d 621; Finley v. State, 1947, 84 Okl.Cr. 309, 181 P.2d 849.

■ From these cases we discover that the pivotal point to be determined is who first suggested, initiated or induced the commission of the crime. Herein the State produced evidence to show that an informer advised them that the defendant had marihuana to sell and the State furnished a person to buy, giving him marked

money, and that he did make a purchase and both the purchaser and seller were immediately arrested and searched, and the defendant had the marked money and the purchaser, Robert Grimes, had the marihuana. According to the testimony of the decoy, Grimes, defendant told him that if he needed a larger supply that he could get it for him; that there was no limit to what the defendant could furnish.

In opposition to this evidence is the testimony of the defendant that McCarthy, acting with the knowledge of the officers, suggested the sale of the marihuana and even furnished it to the defendant, $475 worth. As we view the factual matters, the court's Instruction No. 5 permitted the jury to find for the defendant and discharge him if they believed his theory of the case, rather than the testimony of the officers. The issue seems to us to have been clearly drawn and the jury believed the officers rather than the defendant.

It is true, from his past record, that Harry McCarthy might have been capable of doing the things that defendant accused him of, but there was no evidence that the officers had knowledge of any such scheme on the part of McCarthy. In fact, the officers were not cross-examined as to any such machinations with McCarthy, or even asked whether or not they furnished the marihuana. The jury probably did not put much credence in defendant's testimony that McCarthy would furnish defendant $475 worth of marihuana and thereby suffer the loss, when some lesser amount, say $25 worth, would have been sufficient. Further, there is no evidence as to whether or not it was necessary to have a key in order to lock the defendant's car, and if so whether or not he furnished such key to McCarthy. The jury no doubt pondered this question. Defendant never introduced into evidence the note that McCarthy purportedly wrote the defendant and left in his car with the narcotic. The jury just did not believe the defendant, and it was within the province of the jury to determine the factual questions presented. It is

not the function of this court to weigh the evidence. Landon v. State, 82 Okl.Cr. 336, 166 P.2d 781; Ratcliff v. State, Okl.Cr., 289 P.2d 152; Coats v. State, 90 Okl.Cr. 217, 212 P.2d 141, 214 P.2d 455.

█ While not generally known perhaps, there is a branch of the Attorney General's office known as the Division of Regulated Drug Enforcement, and that division has funds set aside to be used as "evidence money" for the purpose of purchasing narcotics through decoys where persons are offering narcotics for sale.

The Attorney General argues:

"The planning of the commission of this crime was not originated by the Division of Regulated Drug Enforcement of the Attorney General's office, the sheriff's office of Tulsa County, or the police department of Tulsa, Oklahoma, or any other person or persons acting under the direction of said officers. It was conceived in the mind of the defendant and finally executed by him, the officers involved only furnishing him an opportunity to commit the crime."

Apparently the jury so concluded.

The argument that defendant was entitled to an instruction on enticement different from that given and similar to the instruction suggested by this court for the defendant on new trial in Beasley v. State, supra, 282 P.2d 249, is not tenable due to the difference in the factual situations in the Beasley case and the within case, readily apparent on examination of the cases.

█ It is finally argued that the sentence herein should be modified in that it is excessive and influenced by passion and prejudice. Nothing is pointed out to show prejudice. And the only thing in favor of the defendant is that this is the first time he has been charged with marihuana possession, although he was once convicted of whiskey possession, and public drunkenness. To justify and authorize this court in modifying the judgment, legal reasons

must be presented. Nothing is presented to invoke our jurisdiction to modify.

The judgment appealed from must therefore be, and it is affirmed.

JONES, P. J., and BRETT, J., concur.