Steven DUPREE, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. A–16022.

Court of Criminal Appeals of Oklahoma.

Feb. 1, 1973.

Rehearing Denied March 5, 1973.

Bay, Hamilton, Renegar & Lees, Oklahoma City, for appellant.

Larry Derryberry, Atty. Gen., Nathan J. Gigger, Asst. Atty. Gen., for appellee.

## OPINION

BUSSEY, Judge:

Appellant, Steven Dupree, hereinafter referred to as defendant, was charged, tried, and convicted in the District Court of Oklahoma County, Oklahoma, Case No. CRF–69–2743, for the offense of Illegal Sale of Marijuana; his punishment was fixed at two (2) years imprisonment, and from said judgment and sentence, a timely appeal has been perfected to this Court.

At the trial, Jack Henry Kane testified that on September 12, 1969, he was employed by the Oklahoma City Police Department as an undercover agent. At approximately 5:15 p. m., he and a confidential informant went to the home of the defendant in Oklahoma City. The defendant answered the front door and Kane asked him if he had any marijuana for sale. The defendant stated that he did and invited them in. The defendant called to his roommate co-defendant James Andro, who was in the back of the house, asking him "if they had any weed left." (Tr. 7) The defendant then stated to Kane that he was a "narc, which means a narcotics agent." Kane advised the defendant that he was not an agent, whereupon the defendant walked toward the back of the house where Andro handed him a clear plastic bag. The defendant brought the bag to the living room and handed it to Kane.

Kane examined the contents thereof and asked defendant the price. The defendant stated he wanted Ten Dollars. Prior to leaving, Kane asked the defendant if he could get him a kilo of marijuana. The defendant stated that he thought he could but that it would take him a couple or three weeks. Kane subsequently turned the baggie over to Detective Burns. On cross-examination, he testified that on one previous occasion, he attempted to buy marijuana from the defendant. The defendant advised him that "someone had walked off with his stash." (Tr. 13) He further testified that he had seen the defendant over a period of several months prior to the day of the sale.

Detective Burns testified that on the afternoon in question he was conducting a surveillance of Officer Kane. He was working in an undercover capacity for the Narcotics Squad. He observed Kane and the confidential informant ring the doorbell at 1317 North Klein. He observed the defendant come to the front door of the residence and the officer and the informant entered the residence. Approximately 10 to 12 minutes later, they came out of the residence and drove to a prearranged location, whereupon Kane gave him a clear plastic baggie, containing a green leafy substance. Burns subsequently transported the baggie to the state chemist for chemical analysis. The party stipulated that the plastic baggie, which Officer Kane testified he obtained from the defendant, was in fact marijuana.

For the defense, several witnesses were called, who testified as to defendant's good character and reputation. His mother and father testified that the defendant lived in the State of California until returning to Oklahoma around August the 1st.

The defendant testified that he was twenty-two (22) years old, and that on the day in question was employed by the Gold Cross Ambulance Company. He thought he was introduced to John Kane by the informant Don Stokes, whom he had known in high-school. He testified that he had

been approached either by the informant alone or by the informant and Officer Kane on three prior occasions, trying to buy marijuana from him. On September 5, Don Stokes came up to him in a grocery store and asked him if he wanted to buy a tablet of LSD. He replied that he did not want to buy it, because he did not have any money. Stokes replied, "Well, I'll just go ahead and give it to you, and you can pay me later." (TR. 50) On September 12th, he heard the doorbell ring and his roommate, Jim Andro answered the door. He walked to the front of the house and observed John Kane and Stokes in the living room. Stokes stated that he was there to collect the Five Dollars ($5.00) for the LSD tablet. He testified that he paid Stokes Five Dollars, although he had flushed the tablet down the toilet. Stokes then asked him if he had any marijuana he wanted to sell. He informed Stokes that he did not, but that he would see if his roommate Andro had any. He went to the back bedroom and told Andro that "Don wants to buy some marijuana." Andro replied that he had some and handed him a little bag of marijuana. He returned to the living room, and started to hand the marijuana to Stokes and said, "I heard you all were narcotics officers." (Tr. 55) Stokes and Kane both stated that they did not have anything to do with law enforcement. Stokes then handed him a Ten Dollar bill for the marijuana. He testified that he had never participated in that type transaction before. He further testified that he had smoked marijuana on one occasion and that it made him sick. He denied telling Officer Kane that he could get him a kilo of marijuana.

The first proposition asserts that the court committed reversible error in giving Instruction Number Seven (7) to the jury and in refusing defendant's requested Instruction Number One.

The defendant's requested Instruction Number One reads as follows:

"The defendant has interposed as one of his defenses, the defense of Entrapment.

And in this connection, you are instructed that if you believe from the evidence that the officers, or those acting under them, first suggested the commission of the criminal act, or did first lure the accused into the commission of such acts, then and in that event, it will be your duty to hold for the defendant and acquit him.

"However, if you believe from the evidence that the first suggestion for the commission of the crime came from the defendant and that all of the essential acts constituting the crime were done by him, then the fact that the officers, or those acting under them, furnished an opportunity and lent aid in the commission of the offense less than the performing of some essential act constituting the offense, then, and in that event, the defense of entrapment would not apply."

The Court's Instruction Number Seven (7) reads as follows:

"The defendant, as one of his defenses herein, has pled entrapment. In this connection you are instructed that one who is instigated, induced, or lured by an officer of the law or other person, for the purpose of prosecution, into the commission of a crime which he had otherwise no intention of committing may avail himself of the defense of 'entrapment.' Therefore, if you find the defendant was induced or lured by an officer of the law or other person, for the purpose of prosecution, into the commission of a crime which he had otherwise no intention of committing, then in that event, it will be your duty to hold for the defendant and acquit him. Such defense is not available, however, where the officer or other person acted in good faith for the purpose of discovering or detecting a crime and merely furnished the opportunity for the commission thereof by one who had the requisite criminal intent. *In other words, an officer may make himself available to one*

*who intends to commit a crime.* (Emphasis Added.)

"Accordingly, entrapment is not available as a defense to a person who has the intent and design to commit a criminal offense and who in fact does commit the essential acts constituting it, merely because an officer of the law, in his effort *to secure evidence against such person,* affords him an opportunity to commit the criminal act, or purposely places facilities in his way or aids and encourages him in the perpetration thereof, particularly or at least where the doing of the particular act is a crime regardless of the consent of anyone. However, the officers cannot employ extraordinary temptations or inducement to commit the crime.

"The principle of entrapment places no limitation on the right of officers to obtain evidence of any crime originating in the mind of another; *and an officer may, when acting in good faith with a view to detecting crime, make use of deception, trickery, or artifice. It is perfectly legal and proper for an officer to work undercover in detecting crime.* He is not required to advise the defendant at the time of the commission of the alleged offense that he is an undercover agent, nor is he required to tell defendant that if defendant does sell him marijuana, the facts leading up to the sale and the sale itself will be used against him in a court of law; nor is he required to make an immediate arrest, particularly if such an arrest would end a continuing undercover investigation, but a charge may be filed and an arrest made at the end of the undercover investigation." (Emphasis added.)

■ The defendant argues that the Court's Instruction overstates the negative aspects of entrapment and further that it does not correctly and thoroughly state the law. We are of the opinion that this proposition is without merit. We are of the opinion that the trial court's instruction contains a clear and correct statement of the laws of entrapment. In Owens v. State, Okl.Cr., 438 P.2d 21, we stated in the Fourth Syllabus:

"It is not error to refuse requested instructions which are proper statements of law when such requested instructions are substantially covered by the instructions given by the court."

■ The second proposition contends that the evidence presented by the State is insufficient to support a verdict of guilty against the defendant. The defendant cites as authority Jones v. State, Okl.Cr., 481 P.2d 169, wherein we stated:

"Although by statute in Oklahoma, one who 'aids and abets' is a principal in a crime, a conviction cannot be obtained if there is 'no proof of a conspiracy or prearranged plan' between the alleged abettor and the one who actually commits the crime."

We are of the opinion that the facts in the instant case are thoroughly distinguishable from *Jones, supra.* In *Jones,* the defendant was not present when the money was exchanged and when the marijuana was transferred, nor was there any evidence that the defendant received any benefit from the sale. In the instant case, Officer Kane testified that when the defendant answered the front door he asked him if he had any marijuana to sell. The defendant advised him that he did and the officer entered the house. The defendant then called back to his roommate Andro, inquiring "if *they* had any weed left." (Tr. 7) After the sale was consummated, the officer asked the defendant if he could get him a kilo of marijuana later on and the defendant advised him that he "thought he could." In the recent case of Dean v. State, Okl.Cr., 43 O.B.A.J. 2905, A–16,793, we stated:

"With reference to defendant's contention that there was no proof of a conspiracy or prearranged plan between George Edge and defendant to convict the defendant for the sale of LSD, we believe the circumstances testified to were sufficient to show an equal interest, as well as affirmative participation

by defendant in the sale. It is well settled law that responsibility as an aider or abettor can be shown by circumstantial evidence. See: Love v. State, Okl.Cr., 449 P.2d 729 (1969) and Austin v. State, Okl.Cr., 418 P.2d 103 (1966)."

The defendant further argues under this proposition that the State failed to present satisfactory proof that a crime was in fact committed. The defendant states in his brief that "the only proof that the substance in question was marijuana was the stipulated statement of the court that the State Chemist, whose name wasn't even furnished, 'indicates that contents (of the baggie) was, in fact marijuana.'" The defendant further states that "no proof was presented as to the qualifications of the State Chemist. No proof was presented as to whether he conducted any scientific tests to determine the identification of the substance. No explanation was presented as to just what is meant by the word 'indicates.'" We need only to observe that the court did not read the entire stipulation to the jury. The record reflects that prior to empaneling the jury the parties agreed to the following stipulation:

> "*That if Bryan L. Tipton were called as a witness for the State his testimony would be that he is the chief chemist for the Oklahoma State Bureau of Investigation,* that on 15th day of September, 1969, Police Officer G. A. Burns delivered to him one clear plastic bag containing a green leafy substance, seed, and stem; that he tested the contents of this bag, using the microscopic and duquenois chemical test, and both such tests indicated that the material itself was marijuana. (Emphasis Added)

"BY MR. BAY: Let's don't use the word indicated; lets use—

"BY MR. MILLER: Which proved that it was marijuana. It is further stipulated and agreed that if Bryan Tipton were present in Court he would produce the same marijuana and verify that it had been in his possession continuously from the time that it was delivered to him by

Detective Burns until it was presented in court today. That's all.

"BY MR. BAY: I'll so stipulate.

"BY THE COURT: Okay. Anything further we need to do, gentlemen?

"BY MR. MILLER: And we need to further stipulate that this is the same marijuana that Officer John Kane purchased from Steve Dupree on the 12th day of September, 1969, and subsequently delivered to Detective Burns, who subsequently delivered it to Bryan L. Tipton.

"BY MR. BAY: I will so stipulate. (Tr. 3, 4)

■ The final proposition asserts that the prosecuting attorney committed reversible error in his closing argument. We have carefully examined the alleged improper argument and are of the opinion that the same is not so grossly improper and unwarranted as to be manifestly prejudicial to the defendant. We have previously held that it is only when argument by counsel for the State is so grossly improper and unwarranted as to affect defendant's rights, that a reversal can be based on improper argument. See Pickens v. State, Okl.Cr., 450 P.2d 837. In view of the rather strong evidence of the defendant's guilt and the jury's relatively light verdict, we cannot find that the District Attorney's remarks prejudiced the defendant. The judgment and sentence, is accordingly, affirmed.

BLISS, P. J., concurs.

BRETT, J., dissents.

BRETT, Judge (dissenting):

I respectfully dissent to this decision, as written by Judge Bussey, because I believe the trial court's instruction on entrapment was prejudicial to defendant; and because the prosecutor's closing remarks were highly prejudicial to defendant's receiving a fair trial.

Defendant offered testimony to establish the defense of "entrapment," asserting that he had no intention of committing the sale

of marijuana, and that it was initiated, caused, and brought about by the persistent actions of the law enforcement officer and his agent. The trial court recognized the defense and gave an entrapment instruction. That instruction constitutes one of defendant's objections in this appeal.

The principal prosecution witness was Officer Kane, who had been serving as a narcotics undercover agent. He testified that on September 12, 1969, at about 5:55 p.m., he and a "confidential informant" went to defendant's home, knocked on the door, and was admitted by defendant. However, when defendant testified, he asserted that his roommate admitted the officer, who had the appearance of a "hippie type." The officer testified further, "I asked if he had any marijuana to sell . . . . [He] called back towards the back of the house, and a James Andro came to the doorway, and he [defendant] asked them if they had any weed left . . . and he stopped and came back, and he said to me that he had heard a lot of stories about me and asked me if I . . . was a narc, which means a narcotics officer. I advised him that I was not, and he walked back towards the back of the house, and Mr. Andro handed him a clear plastic bag and [defendant] brought it back into the living room and handed it to me." The officer related that he smelled of the substance in the bag, and gave the defendant a ten dollar bill.

On cross-examination, the officer admitted that on at least one previous occasion he attempted to buy marijuana from defendant, but was unsuccessful. He also denied that the confidential informant had anything to do with the purchase of the marijuana. On the other hand, defendant testified that the informant made the purchase, instead of the officer.

Defendant testified in his own behalf and offered the testimony of four character witnesses, including that of his father and mother. Defendant testified that he had never before been convicted for any crime, and that he had never before made a sale of marijuana. His account of what transpired was very similar to that of Officer Kane, except for details. Defendant related that his roommate admitted the officer and his informant into the living room. Defendant said he had attended high school with the informant, and testified that the informant first asked him for five dollars for one LSD tablet that the informant had given defendant on September 5th. Defendant said he paid the five dollars because he was afraid of the two men; and that after he paid the money to the informant, the informant asked him if he had any marijuana to sell. He testified that he called back to his roommate and asked his roommate if he had any marijuana; that his roommate gave him a packet of it, which he sold to the two men for ten dollars, because he could get his five back for the LSD tablet he didn't want in the first place.

Defendant testified that on at least three different occasions the informant, by himself, or when the officer was with him or nearby, attempted to get him to sell them marijuana, but each time he told the informer he didn't have any. He related the first time the informant approached him in the parking lot while he was leaving the "Blue Goose Bar," and asked defendant if he had any marijuana to sell, but defendant said he did not have any and that he didn't know where any was—he didn't have anything to do with marijuana. On that occasion he didn't see the officer. Defendant testified that about a week later, when he and his roommate drove up in front of the place where they lived, defendant noticed a green Camaro in front of the house. He testified that Don Stokes, the informant, "came over to me and said he'd like to introduce us to somebody, and then we, Jim Andro and I and Don Stokes, we sat in the Camero, and Don Stokes introduced me to a gentleman. He said his name was John Kane. Then he, Don Stokes, asked me again if I had any marijuana to sell, or asked me if I knew where he could get some. I told him I didn't have any marijuana to sell."

Defendant testified further that about a week before September 12th, he stopped at Little Dee's Grocery Store, "and when I pulled into the parking lot, I noticed the same, it looked to be the same, Camero in the parking lot, I had seen before. I walked past the car on my way to the store, and I noticed John Kane and Don Stokes sitting in the car. I walked into the grocery store and I was shopping around, Don Stokes came up to me in the grocery store and asked me if I wanted to buy a tablet of LSD, and, of course, I told him, I said 'No, I don't have any money.' He said, 'Well, I'll just go ahead and give it to you, and you can pay me later,' and so, I don't know, I didn't want the LSD, but these people had been after me and after me about selling them marijuana." Defendant said when he left the store, "Don Stokes and John Kane were standing in front of the store and they asked me if, if I had any marijuana to sell them, and of course I told them no, I didn't. [A]nd then Don Stokes turned to John Kane and said, 'Well, we did have some marijuana that we were selling, but we sold it all.' And then we,—of course, they got back in their car, and I got back in my car and left."

With reference to the September 12th incident of sale, defendant testified, "I was in the bathroom cleaning up and getting ready for a date, when I heard the doorbell ring, and a few minutes later Jim, my roommate, came to the door and asked me, well, he said that 'John Kane and Don Stokes are in the living room, and they're there to collect the five dollars that you owe Don for the LSD.'" He related further that he went into the living room and Don Stokes said to him, "Well, Steve, I'm here to collect five dollars for the tablet of LSD that I sold you." Defendant said he didn't argue with them and paid the five dollars because they both were bigger than he is. Defendant testified that Don Stokes asked him if he had any marijuana to sell and defendant told him, "No, sir, I don't, but I will see if my roommate, Jim Andro, has any." Defendant related that he went to Jim Andro's room and told him they wanted to buy some marijuana and Jim

had some and gave him a little bag of marijuana. Defendant testified that before he gave it to Don Stokes, "I said, you know, I asked him and Officer Kane, I said, 'I heard you all were narcotics officers.' and they said, 'No, sir, we're not; we're sure not.' I asked them if they had anything to do with law enforcement, and they said no." Defendant testified that he accepted the ten dollars, because that way he could get back the five dollars he had given Don Stokes for the LSD he didn't want.

The record shows that defendant offered sufficient testimony to establish the defense of entrapment, if believed by the jury. Defense counsel offered a requested instruction on the defense of entrapment, which was refused by the court with the note, as being given in substance. In arguing for his requested instruction, counsel cited this Court's decision in Beasley v. State, Okl.Cr., 282 P.2d 249 (1955), but the court refused defendant's instruction and made the following statement to both counsels, while in chambers:

"I have studied your Requested Instruction, and it is as set out in Beasley vs. State. Of course, in Beasley vs. State, why the Court said, at page 252, quote 'The question presented is one of first impression in this State.' unquote.

"There are some later cases that I don't have at my fingertips, but I think the Instruction I have given, Number 7, is an accurate statement of the law and will more adequately represent and present to the jury the matter that they will be called upon to determine with reference to precisely what entrapment means, and the elements to take into consideration, drawing from the evidence in this case in this record, measures up to the legal defense of entrapment."

However, the question of first impression considered by this Court in Beasley, supra, pertained to Beasley's contention that the instruction should cover the entrapping person's first suggesting, or first luring, the accused into the commission of the crime and did not pertain to the instruction on entrapment as a defense. In Beasley,

*supra,* the entrapment instruction used by the trial court had "been upheld in many cases in Oklahoma where officers or those acting as decoys for them were allegedly involved in the initial steps heading up to the commission of the purported crime." [Citations at page 251, 282 P.2d omitted.] Concluding the opinion, this Court stated in Beasley v. State, *supra:*

> "Upon the retrial of this case instruction number four should be corrected to read as follows:
>
> > 'The defendant has interposed as one of his defenses the defense of entrapment. And in this connection, you are instructed that if you believe from the evidence that the officers, or persons acting under the direction of the officers, or any other persons with a corrupt private purpose to serve, first suggested the commission of the criminal act, or did first lure the accused into the commission of such acts, he being an otherwise innocent person, then and in that event, it will be your duty to hold for the defendant and acquit him.
> >
> > 'However, if you believe from the evidence that the first suggestion for the commission of the crime came from the defendant and that all of the essential acts constituting the crime were done by him, then the fact that the officers, or other persons, furnished an opportunity and lent aid in the commission of the offense less than the performing of some essential act constituting the offense, then, and in that event, the defense of entrapment would not apply.' "

Defendant's first proposition asserts that the trial court committed reversible error in giving instruction number seven. After reviewing the court's instruction, I conclude that as an abstract statement of the law, it contains no inaccuracies; but, for the layman juror, it overstates the prosecution's position and shifts the entire burden to defendant, and therefore defeats the defense of entrapment. Under a proper instruction

on entrapment, defendant would have been entitled to acquittal if the jury should have found that he had no previous intent or purpose to commit the offense, and that he did so only because he was induced by the officer, or the officer's confidential informant.

The third paragraph of the court's instruction commenced: "The principle of entrapment places no limitation on the right of officers to obtain evidence of any crime originating in the mind of another . . . ." As a statement of law that is correct, but the purpose for the instruction is to place before the jury the issue, or issues, to be determined by the jury. Whether or not the intent to commit the crime originated in defendant's mind was one of the issues to be determined by the jury. There was sufficient testimony before the jury to raise the issue of entrapment; and as the Court of Appeals stated in Notaro v. United States, 363 F.2d 169 (9th Cir. 1966):

> "The issue [of entrapment] having appeared, it becomes the prosecution's burden to establish beyond a reasonable doubt that the accused was not entrapped into the commission of the offense." at page 175.

Consequently, I believe that the issue having been raised by defendant, the jury was entitled to have had an instruction which merely placed before it the issues to be determined concerning the defense of entrapment, and not a discourse on the law of entrapment. Judge Learned Hand stated in United States v. Sherman, 200 F.2d 880 (2d Cir. 1952):

> "[I]n such cases [of entrapment] two questions of fact arise: (1) did the agent [or his confidential informant] induce the accused to commit the offense charged in the indictment; (2) if so, was the accused ready and willing without persuasion and was he awaiting any propitious opportunity to commit the offense. On the first question the accused has the burden; on the second the prosecution has it." See also Hansford v.

United States, 112 U.S.App.D.C. 359, 303 F.2d 219 (1962), and Johnson v. United States, 115 U.S.App.D.C. 63, 317 F.2d 127 (1963).

The third paragraph of the trial court's instruction went beyond the placing of the two issues before the jury, and must have left the impression that the court assumed the defendant had the required intent. Also, whether or not the undercover agent must advise the defendant that he is an undercover agent, is not contained in the issues to be considered; nor are the elements of the "Miranda warnings" any part of the instruction. Consequently, the jury must have viewed the court's instruction as requiring a finding of guilty, regardless of the fact that defendant may not have had any previous intent to sell marijuana. "When a party has the burden of proof as to a factual issue, it cannot be proper that instructions pertaining to the issue are so vague or ambiguous as to permit of misinterpretation by the jury of the standard which is to be applied." Notaro v. United States, *supra,* at page 175.

This Court also stated in Colby v. State, 57 Okl.Cr. 162, 46 P.2d 377 (1935):

> "The trial court is never warranted in giving an instruction which has the effect of determining controverted questions of fact."

Defendant also complains that the prosecutor committed reversible error in his closing argument to the jury. The record is clear that defendant had no record of previous convictions, and there was absolutely no showing that defendant had previously possessed, or sold, any marijuana. But, nonetheless, the prosecutor argued to the jury, "This man is not charged with just possession of marijuana; this man is what we call a pusher; he sells it." Defendant's objection was overruled and the court stated, "It is a reasonable inference and deduction from the testimony and evidence." Defendant asserts the court's comment "joined the State in branding the defendant a 'pusher'."

There is no doubt in my mind but that the prosecutor's reference to defendant as being a "pusher," used in its connotation in this trial, must have had an adverse influence on the jury, sufficient to prejudice defendant. Insofar as no evidence was offered by the state to show that defendant had made any other sales of marijuana, or any other type of hallucinogenic stimulant, or illegal drug, it was improper to refer to defendant as a "pusher." It is highly doubtful, under the facts of this case, that the one sale is sufficient to connote defendant a "pusher" or "dealer" in marijuana. Under circumstances which reflect an accused had made other sales would no doubt place a different significance to the term.

While the prosecutor is entitled to wide latitude in drawing any reasonable inference from the evidence and testimony produced, he should not go outside the record for the purpose of inflaming and arousing the jury's passions and prejudice.

In face of the record before this Court, the prosecutor's remark is wholly unsupported. This Court stated in Thurmond v. State, 57 Okl.Cr. 338, 48 P.2d 845 (1935):

> "A public prosecutor is presumed to act impartially in the interest only of justice. If he lays aside the impartiality that should characterize his official action to become a heated partisan, and by vituperation of the prisoner seeks to procure a conviction at all hazards, he ceases to represent public interest which demands no victim and seeks no conviction through the aid of passion, sympathy, or resentment, and the only way to secure a fair trial is to set aside the verdict so procured."

As I view the prosecutor's closing argument, he ceased to "act impartially in the interest of justice." He admitted to the court that he thought he was supposed to make an impassioned plea, when defendant offered his objection to the closing arguments.

Therefore, for the reasons herein stated, I respectfully dissent to this decision.